Andra BROWN, Plaintiff,

v.

Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.

No. 03–C–0686.

United States District Court, E.D. Wisconsin.

Jan. 26, 2004.

---

David G. Dreis, Soc. Sec. Disability Benefits Law Center, Milwaukee, WI, for Andra Brown.

Nora Sheehan Barry, Lennie Lehman, U.S. Dept. of Justice (ED-WI), Office of U.S. Atty., Milwaukee, WI, for Jo Anne B. Barnhart.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Andra Brown brings this action under 42 U.S.C. § 405(g) for judicial review of the decision of defendant JoAnne Barnhart, Commissioner of the Social Security Administration, denying her application for benefits under the Social Security Act. In her application, plaintiff alleged that she was disabled due to neck and back pain following a car accident. Denied by the Administration initially and on reconsideration, she sought and obtained a hearing before an Administrative Law Judge (ALJ). However, the ALJ issued a decision finding that plaintiff was not disabled. When the Appeals Council denied plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner. See Gudgel v. Barnhart, 345 F.3d 467, 468 (7th Cir.2003).

For a variety of reasons, plaintiff asks that I reverse the ALJ's decision and remand the matter either for an award of benefits or further proceedings. The Commissioner defends the decision, arguing that it was adequately supported by the evidence and free of harmful legal error. The matter has been fully briefed and is ready for decision.

### I. APPLICABLE LEGAL STANDARDS

#### A. Disability Standard

In order to obtain benefits under the Social Security Act, plaintiff must be disabled, that is, she must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). She must show that her "impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has adopted a sequential five-step test for determining whether a claimant is disabled. See 20 C.F.R. §§ 404.1520; 416.920. Under this test, the Commissioner must determine: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether any of the claimant's impairments are listed by the Administration as being so severe as to preclude substantial gainful activity;[1] (4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform her past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of her age, education and work experience. E.g., Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir.2000); Rucker v. Chater, 92 F.3d 492, 494 (7th Cir.1996).

The claimant will automatically be found disabled if she makes the requisite showing at steps one through three. See Henderson ex rel. Henderson v. Apfel, 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three,

---

1. These impairments are listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

she must then demonstrate that she lacks the RFC to perform her past work. *Id.* If she makes this showing, the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.* The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of her limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2. *See Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). The Grid is a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. *See Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987); *see also Heckler,* 461 U.S. at 461–62, 103 S.Ct. 1952; *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988).

However, the Commissioner may not rely on the Grid if the person's attributes do not correspond precisely to a particular rule, *see Caldarulo,* 857 F.2d at 413, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the applicant's range of work, *see Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001) (citing *Luna v. Shalala,* 22 F.3d 687, 691 (7th Cir.1994)). In such a case, the Commissioner must solicit the testimony of a VE, *Herron v. Shalala,* 19 F.3d 329, 337 (7th Cir.1994), although she may use the Grid as a "framework" for making a decision, *see* 20 C.F.R. § 404, Subpt. P, App. 2, § 200.00(e)(2).

**B. Standard of Review of ALJ's Decision**

■ Under § 405(g), a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the court's review of the ALJ's decision is limited, and the ALJ's factual findings must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir.2000). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Sec'y of Health & Human Servs.,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review "must be more than an uncritical rubber stamp." *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984).

■ Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, reweigh the evidence or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000); *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion,* 108 F.3d at 782.

■ If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th

Cir.1989). The ALJ commits such an error if she fails to comply with the Commissioner's regulations and rulings. *See Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991).

■ The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, she must provide at least a glimpse into her reasoning. *Zurawski*, 245 F.3d at 889. "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.'" *Hodes v. Apfel*, 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (1996)).

■ Finally, ALJs "must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan*, 98 F.3d at 970. "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Administrative Decisions

Plaintiff applied for benefits on December 28, 2000, claiming that she had been unable to work since December 7, 1999 due to "pain" and "two dislocated discs." (Tr. at 32, 37.) She indicated that she had attempted to work for temporary agencies after the alleged disability onset date but was forced to stop due to pain. (Tr. at 37, 50–51.) She wrote that her primary physician was Dr. Flowers, and that she had

treated with him for pain from December 8, 1999 to July 10, 2000. (Tr. at 39.)

In a Pain Questionnaire, plaintiff indicated that she been in constant pain since an automobile accident on December 7, 1999. She stated that she had been taking prescription-strength Tylenol and Ibuprofen, but nothing relieved the pain. (Tr. at 58.) She indicated that she tried to reduce the pain by using heating pads, soaking in hot water, going to therapy sessions, obtaining massages and using ointments. She wrote that she was very restless at night due to pain in her back, and that her sleep was often interrupted. She stated that she was unable to do her household chores without pain, drive for long periods, and sit or stand for an extended time. (Tr. at 59.)

In a Work History Report, plaintiff indicated that she had worked as a phlebotomist from 1985 to 1998, as a machine operator in 1999, and as a factory worker in 2000. (Tr. at 60.) The phlebotomist job required plaintiff to be on her feet six out of eight hours and lift less than 10 pounds. (Tr. at 61–63.) The machine operator job required plaintiff to walk/stand eight hours per day, and required no lifting and carrying. (Tr. at 64.) Finally, the laborer job required plaintiff to be on her feet eight hours per work day and lift less than 10 pounds. (Tr. at 65.)

On or about May 30, 2001 the Administration issued its initial determination denying plaintiff's application. (Tr. at 19.) The Administration concluded that plaintiff retained the ability to perform all but heavy labor and thus was able to return to her past work. (Tr. at 22.)

Plaintiff filed a request for reconsideration on July 26, 2001. (Tr. at 25.) She stated that her "condition is steadily getting worse. The pain in my back, arms and hands has increased. I am experiencing numbness in my arms and hands and I

can not perform daily activities without being in severe pain." (Tr. at 25.) In her Reconsideration Disability Report, plaintiff stated that she had increased her pain medication, but that the pain and numbness made it increasingly difficult to perform most types of activities. She claimed to lack the dexterity to perform the duties of a phlebotomist. She wrote that she was constantly in pain every day and that her personal hygiene and personal daily care took longer due to the pain. (Tr. at 72.) She stated that when she took pain medication she felt "drugged" and functioned in slow motion. (Tr. at 72.) She stated that at the time (July 2001) she was working for Aldrich Chemical Company as a chemical packer, and that she could not let the employer know of her problems because she needed to work to pay her medical bills. (Tr. at 72.) Her duties at Aldrich involved measuring chemicals and screwing lids on containers. She stated that she was supposed to sit to perform her job but was constantly getting out of her chair due to back pain. She stated that her co-workers complained because she was not performing up to standards, and that she could not screw the lids on tight enough due to pain and numbness in her hands. (Tr. at 73.)

On or about November 16, 2001, plaintiff's request for reconsideration was denied. (Tr. at 20, 27.) The Administration concluded that while plaintiff had a severe impairment she was able to return to her past work as a phlebotomist. (Tr. at 85.)

Plaintiff then requested a hearing before an Administrative Law Judge. (Tr. at 31.) She stated that she had worked one day for a temporary agency in October 2001 but had to quit due to severe back pain. (Tr. at 92, 96.) On December 19, 2002, plaintiff, represented by counsel, appeared before ALJ Margaret O'Grady. (Tr. at 272.)

## B. Hearing Testimony

Plaintiff and VE John Schroeder were the only witnesses at the hearing.

### 1. Plaintiff's Testimony

Plaintiff testified that she was 48 years old, four feet eleven inches tall, 130 pounds, and lived with her husband and adult children. (Tr. at 274.) She stated that she had completed the 11th grade in school and had not obtained a GED. (Tr. at 274–75.)

Plaintiff stated that she had last worked in 2001 as a light assembly packer. (Tr. at 275.) She stated that she worked on that job for only a few days before leaving due to pain. (Tr. at 276.) Prior to that, she had worked for a few months as a chemical packer but also had to leave that job due to pain. (Tr. at 276.) Prior to that, she had worked for several months as a factory machine operator at two locations through a temporary service. (Tr. at 276–77.) She also left those jobs due to pain. (Tr. at 277.) Before that, she worked as a phlebotomist at the VA Medical Center from 1990 to 1998. (Tr. at 278.) She testified that she stopped working there to take care of her husband, who was disabled due to multiple sclerosis. (Tr. at 278.)

Plaintiff testified that her pain was the result of the 1999 motor vehicle accident. (Tr. at 288.) She stated that she had near constant pain in both hands, with numbness in her fingers. (Tr. at 280.) She said that she took medication and applied heat to relieve the pain. (Tr. at 280.)

Plaintiff testified that she also had pain in her neck. She stated that she experienced this pain about every other day and that it lasted about three hours at a time. She applied heat and took medication for relief. (Tr. at 280.)

Plaintiff further testified that she had pain in the low and mid back about three days per week. She stated that the pain would last about two or three hours, and that she would try to relieve it by lying down, applying heat and taking medication. Plaintiff also testified that she experienced headaches about twice per week, with a duration of two to three hours. (Tr. at 281.) In order to relieve headaches, plaintiff stated that she would make it quiet in the house, apply a compress, take medication and rest. (Tr. at 281–82.)

Regarding medication, plaintiff testified that she took four Neurontin per day, four Darvocet per day, and used a Lidoderm patch for twelve hours per day. (Tr. at 282.)[2] She also stated that she used a TENS unit[3] and had received cortisone shots in her elbows, back, hip and neck. (Tr. at 288.) Plaintiff stated that the medication made her drowsy. (Tr. at 282.)

Plaintiff testified that on a good day she would be up and about for four hours out of the day, e.g., folding clothes or putting dishes away. On a bad day, she would remain in bed all day. (Tr. at 283.) She estimated that she had three good days and three bad days per week. She stated that her daughter helped her shower on a bad day but that she was able to bathe herself on a good day. Plaintiff testified that she did not often cook because it hurt when she stood. She stated that her husband was fed through a tube and that her daughter assisted him with that. (Tr. at 283.) She testified that she sometimes washed dishes, but her daughter did the laundry. (Tr. at 283–84.) She said that she dusted a little but her daughter did most of the cleaning. (Tr. at 284.) She

testified that when she tried to read her memory would fade, and she would have to re-read. (Tr. at 284.) She stated that she did physical therapy twice per week but did not exercise due to pain. (Tr. at 284.) She said that she made small purchases at the grocery store but that her daughter did the bulk of the shopping. (Tr. at 285.) She testified that her daughter and an assistant from the "VMA" tended to her husband.[4] (Tr. at 285.) She stated that someone was always there to care for him. (Tr. at 290.) She stated that she had difficulty sleeping due to pain and numbness. (Tr. at 288–89.)

Plaintiff testified that she could walk about 2½ blocks, stand about 30 to 45 minutes, and sit 20–30 minutes before the pain would become severe. (Tr. at 286.) She said that she could lift 20 or 30 pounds, could not bend or stoop without pain, and could not use her hands without them getting numb and throbbing. (Tr. at 286.) She said that she had trouble with her hands while combing her hair, opening a can or vacuuming. (Tr. at 287.)

### 2. VE's Testimony

VE Schroeder characterized plaintiff's past work as follows: phlebotomist—light, semi-skilled work; machine operator—light, unskilled work; assembly and packaging—unskilled and sedentary. (Tr. at 292.) The ALJ then asked if the following hypothetical person could perform any of plaintiff's past work: 48 years old, with an 11th grade education and plaintiff's work history, capable of medium exertional level activity, able to occasionally perform postural-type activities (e.g., climbing, stoop-

---

2. Plaintiff's medications are listed at page 238 of the transcript.

3. The transcript refers to an "Attends unit" but presumably this is an error in the transcription of the hearing tape.

4. It is unclear what the acronym "VMA" referred to, but presumably it was a visiting nurse agency.

ing, kneeling). (Tr. at 292–93.) The ALJ stated that the person could perform the phlebotomist and assembly jobs, but not the machine operator job. (Tr. at 293.)

The ALJ then asked about an individual who had to avoid frequent repetitive motions or bending of the neck, avoid repetitive motion and vibration-type use of equipment with both hands, could lift 20 pounds maximum and 10 pounds frequently, and had to avoid extremes of temperature and humidity. (Tr. at 293, 296.) The VE stated that such person could perform attendant/monitor-type jobs, of which there were 1800 in the four county Milwaukee area. (Tr. at 297.) If the person needed a sit/stand option the number of jobs would be reduced to 900.[5] (Tr. at 297.) If the same person was capable of sedentary rather than light work, there would be 800 positions.[6] (Tr. at 298.)

Finally, the ALJ asked about an individual capable of light work, occasional climbing or stooping, no kneeling or crawling, occasional balancing or crouching, and in need of a sit/stand option. (Tr. at 298.) The VE stated that the only past work such person could do was the assembly and packaging job. (Tr. at 298.) If the exertional level was reduced to sedentary, the answer was the same. (Tr. at 298.) If the restriction of no repetitive use of the hands was added, the assembly/packaging job would be eliminated, but the person could still perform the attendant/monitor position, of which there were 1200 in the four county Milwaukee area. (Tr. at 298.) If the exertional level was reduced to sedentary, there would still be 1000 attendant/monitor jobs. (Tr. at 298–99.)

Plaintiff's counsel asked if the attendant/monitor position could be performed if the person could not use her hands or fingers for gross or fine manipulation for more than 10% of the day. The VE said "no." (Tr. at 299.) The VE also stated that if the person required 10 unscheduled breaks during the day or would be absent more than four days per month, the work would be eliminated. (Tr. at 299–300.) Further, if the person was able to sit, stand and walk for a total of only four hours per workday, the work would be eliminated. (Tr. at 300.) Finally, if the person had frequently impaired concentration and problems tolerating work stress, all employment would be prohibited. (Tr. at 300–01.)

## C. Medical Evidence

### 1. Treating/Examining Sources

As is relevant to her application for disability benefits, plaintiff initially received her primary care from Dr. James Flowers at the MFM Medical Clinic. Plaintiff first saw Dr. Flowers on December 8, 1999, following the auto accident the previous day. (Tr. at 124.) Plaintiff was a rear seat passenger when the minivan in which she was riding rear-ended an SUV. (Tr. at 172.) Her right elbow hit the passenger side door, and her right shoulder and head hit the front of the front passenger seat. (Tr. at 173.) She indicated there was a "popping/twisting of her neck" and both of her hands were jammed into the seat in front of her. (Tr. at 173.)

Plaintiff was taken to the St. Michael's Hospital emergency room, complaining of

---

5. Some individuals must, due to their impairments, go regularly from a seated to a standing position and vice versa. If the need to change positions cannot be "accommodated by scheduled breaks and a lunch period," SSR 96-9p, the person needs a so-called "sit/ stand option," i.e. the freedom to change positions as necessary.

6. Although the VE did not say so, presumably the person in the second series of hypotheticals could not perform plaintiff's past work.

back, neck, elbow and shoulder pain. (Tr. at 105, 107, 108.) X-rays taken of plaintiff's cervical spine and right elbow were normal. (Tr. at 106.) She was prescribed Motrin 800 and released. (Tr. at 109.)

However, when she saw Dr. Flowers the following day she stated that the Motrin was not helping, and complained of headaches, and neck, back and right shoulder pain. (Tr. at 127, 173.) Dr. Flowers excused her from work, scheduled her for thrice weekly therapy sessions and prescribed pain medication. (Tr. at 138–39.) Plaintiff attended therapy at MFM Medical Clinic through May 2000. (Tr. at 142–57.) Plaintiff had her final visit to Dr. Flowers on July 10, 2000. In a July 2000 report, Dr. Flowers detailed plaintiff's treatment and prognosis. (Tr. at 172–83.)

Dr. Flowers indicated that his initial diagnoses were: (1) contusion to the right side of the head, (2) carpal tunnel syndrome, (3) contusions to the right upper extremity, (4) acute neck strain, (5) post-traumatic headaches and (6) acute back strain. Plaintiff received a variety of therapies, including hot packs, ultratone, vibration therapy, magnatherm therapy, soft tissue therapy, ultrasound, HILLS table and therapeutic exercises. Plaintiff achieved a reasonable degree of recovery, some improvement of motion and some improvement in function through these therapies. (Tr. at 176–77.)

On January 6, 2000, plaintiff returned to Dr. Flowers still complaining of pain in the mid to low back and right elbow. She noted the onset of numbness in the right hand. Her headaches were still present and her right shoulder was sore. Only the contusion to her head had clearly resolved. On physical examination, plaintiff had a normal gait, mild pain around her right arm/elbow area and mild to moderate pain in her mid back region. Dr. Flowers's assessment was that plaintiff was still having epicondylitis symptoms in her right arm, with musculoskeletal type pain in her back and neck. Her complaints of hand numbness showed possible early neuropathy in her hands, consistent with the jamming motions in the car accident.[7] Dr. Flowers directed her to wear a forearm strap, therapy orders were re-done, and she was advised to use prescription medications as needed. (Tr. at 177–78.)

Plaintiff returned on April 17, 2000, still having problems, especially with her right elbow. She stated that she had not been working and had to hire someone to help her husband. Her back was still uncomfortable and felt like it was "going out at times, especially when she walk[ed]." (Tr. at 178.) She experienced pain radiating into her buttocks but not her lower legs. Daily headaches were still present, but medication helped. (Tr. at 178.) Her right shoulder was still sore. (Tr. at 178–79.) Plaintiff stated that she did not think she could work due to the problems she had lifting her husband. On physical examination, plaintiff was still uncomfortable, with mild pain around the lateral epicondyle, in the neck/right upper back region and lower back. (Tr. at 179.) She could forward flex to 60 inches from her toes and could squat 100%. Dr. Flowers's assessment was that plaintiff still had persistent strain and tendonitis in her right arm, back and neck. He ordered x-rays and prescribed Motrin 600 mg. (Tr. at 179.)

Plaintiff returned on June 19, 2000, initially for a final exam, but was still having radicular symptoms in her arms, as well as

---

7. However, the record shows that plaintiff visited the St. Michael Hospital emergency room on September 11, 1999, complaining of tingling in her hands for the previous month and, recently, tingling in her left upper arm. (Tr. at 110–13.) Plaintiff was diagnosed with acute paraesthesia and discharged home in good condition. (Tr. at 113.)

neck symptoms. She also had numbness in both hands. She had pain in her neck and upper back, as well as down the spine. Dr. Flowers discontinued therapy and planned to obtain x-rays and an MRI of the spine and left elbow. Her also referred plaintiff to Dr. Arain for an EMG study on the upper extremities. Plaintiff was to continue her exercises at home, but stop her therapy at the doctor's office. (Tr. at 179.)

On June 21, 2000, Dr. Arain performed an EMG and nerve conduction study on plaintiff's upper extremities. Dr. Arain's impression was one of left carpal tunnel syndrome of mild to moderate severity, without any evidence of denervation, and mild right carpal tunnel syndrome without evidence of denervation. He recommended conservative management with wrist splints. (Tr. at 160.)

On June 21, 2000, Dr. Popovich performed an MRI of plaintiff's cervical spine, which revealed a predominantly central disc herniation between C5 and C6 with subtle impression upon the spinal cord. (Tr. at 163.) On June 22, 2000, Dr. Arras performed cervical spine x-rays, which revealed mild degenerative joint disease at C5–6. Mild straightening of cervical lordosis was also seen, possibly due to muscle spasm. (Tr. at 162.)

Plaintiff had her final visit with Dr. Flowers on July 10, 2000. By that time she had returned to work but was still having problems. Dr. Flowers noted that plaintiff had been off work from December 7, 1999 through May 31, 2000, returning on June 1, 2000. On July 10, 2000, plaintiff was still having pain in her neck, back and upper extremities. She had headaches off and on. However, her right elbow was back to its pre-existing status. (Tr. at 180.) She rated the pain in her neck and upper back as usually six out of ten, currently eight of ten, with the worst being ten out of ten. She stated that she also had low back pain, which was not as significant. She had numbness in both hands. She stated that she was at 50% of her usual activities and that she was using a lot of pain medication. (Tr. at 180.) On examination, Dr. Flowers noted that plaintiff could do a 60–degree squat, with slight assistance, and could forward flex 80 degrees adequately. She still had decreased range of neck motion. (Tr. at 181.)

Dr. Flowers opined that as of the final visit plaintiff's right elbow injury had resolved, and that while she would continue to have headaches they would also resolve over the next 18 to 24 months. Dr. Flowers stated that plaintiff would have permanency due to the herniated cervical disc and bilateral carpal tunnel syndrome. (Tr. at 181.) Dr. Flowers discharged plaintiff with the following permanent restrictions:

1. Avoid repetitive motions of her neck;

2. Avoid repetitive motions, vibration type use of equipment with both hands;

3. A lifting maximum of 20 pounds, 10 pounds frequently; and

4. Avoid extremes of temperature and humidity.

(Tr. at 182.) He advised her to use wrist splints due to her carpal tunnel syndrome. (Tr. at 182.) He opined that she may need orthopedic evaluation of her carpal tunnel and surgical evaluation of her herniated cervical disc. (Tr. at 182.) Plaintiff had additional therapy sessions at MFM Medical Clinic for her hands and low back in August and September 2000. (Tr. at 184–87, 268–69.)

Plaintiff returned to MFM in December 2001 complaining of continued pain in the back and neck, and numbness in the hands. She indicated that she had multiple visits to emergency rooms due to the

pain.[8] (Tr. at 269.) Plaintiff was referred to Dr. King at the Pain Management & Treatment Center, set up with physical therapy,[9] prescribed Vicodin and told to follow-up with Dr. Bhatti. (Tr. at 269.)

In early 2002, plaintiff began receiving treatment at the Pain Management & Treatment Center with Drs. Pamela Thomas–King ("Dr. Thomas–King") and George King ("Dr. King"). Plaintiff first saw Dr. Thomas–King on January 7, 2002, complaining of neck and shoulder pain with bilateral upper extremity radiculopathy. Plaintiff indicated that her symptoms had worsened over the past few months. She stated that her pain was exacerbated with physical activity, and nothing improved it. (Tr. at 263.) On examination, Dr. Thomas–King noted decreased range of motion of the neck secondary to pain and pain on palpation of the spine. (Tr. at 264.) Dr. Thomas–King prescribed Neurontin, Lidoderm patches and Darvocet. She also advised that plaintiff continue physical therapy with Dr. Flowers's office. (Tr. at 264.) She ordered a cervical MRI and an EMG of the upper extremities. (Tr. at 265.)

On January 8, 2002, Dr. Lawson performed an MRI of the cervical spine. (Tr. at 262.) Dr. Lawson's impression was: "Normal cervical spine MRI with the exception of the prominent posterior osteophyte at C5–6 which does slightly narrow the spinal canal and does efface the thecal sac. No encroachment on the neural foramina." (Tr. at 262.) On January 17, 2002, Dr. Borca performed an EMG and nerve conduction studies, which revealed left and right "media neuropathy" but no evidence of cervical radiculopathy. (Tr. at 259–60.)

On January 24, 2002, plaintiff saw Dr. Thomas–King and Physician's Assistant Brian Christofferson, complaining of bilateral upper extremity, neck and lower back pain. However, improvement was noted with decreased pain, enhanced sleep, improved mobility and increased recreational activities. The impression was one of cervical radiculopathy. (Tr. at 256.) She was scheduled for a cervical nerve block. (Tr. at 257.)

On February 2, 2002, plaintiff reported neck and shoulder pain, radiating into the bilateral upper extremities, with decreased range of motion. She received an epidural steroid injection to the cervical spine at C5–C6 and C6–C7 from Dr. Thomas–King. (Tr. at 216.)

Plaintiff returned on March 18, 2002, with continued neck pain radiating into the right arm. Dr. King noted that the previous injection had provided 40–60% pain relief for two to three days. Dr. King administered another injection at C5–6, C6–7. (Tr. at 223.)

Plaintiff saw Dr. King again on April 1, 2002, complaining of severe low back pain. (Tr. at 255.) The doctor noted that she had achieved no progress with respect to improved mobility and increased activities. On examination, there was pain with lumbar facet palpation. The straight leg raise was positive at 75 degrees bilaterally. There was also pain with S1 joint palpation bilaterally.[10] (Tr. at 255.) Dr. King administered a lumbar facet nerve block at L4–5 and L5–S1 on April 3. (Tr. at 222.)

---

8. The transcript contains records from a December 15, 2001 visit to the St. Joseph's Hospital emergency room, during which plaintiff complained of low back pain and other problems. She was provided with medication (Tr. at 203–07.)

9. Plaintiff had therapy sessions for her back, elbows, neck and arms on 12/31/01, 1/2/02, 3/25/02 and 3/26/02. (Tr. at 266–67.)

10. The second page of the 4/1/02 note is missing from the transcript.

On April 30, 2002, a physical therapist (ostensibly at MFM Clinic) prepared a musculoskeletal impairment medical assessment form, which was reviewed and signed by Dr. Bhatti. (Tr. at 209–13.) The form listed plaintiff's diagnoses as sprained back and lumbar facet syndrome. (Tr. at 209.) The form indicated that plaintiff suffered from severe pain in both hands and elbows, and along the entire spine, that she had significantly reduced range of motion of the lumbar and cervical spine, and that her attention and concentration were constantly interfered with due to the pain. (Tr. at 209–10.) The therapist wrote that plaintiff would be unable to handle every aspect of workplace stress listed on the form. (Tr. at 210.)

Regarding plaintiff's exertional abilities, the form indicated that plaintiff could walk 10–20 steps before she had to rest or sit, could sit for 20 minutes then had to lie down, and could stand for 30 minutes then had to sit. Plaintiff could sit and stand/walk a total of less than two hours in an eight hour work day. She would need more than 10 unscheduled breaks during an average work day due to pain. (Tr. at 211.) She could lift less than 10 pounds occasionally, rarely twist or stoop, and had significant limitations with reaching, handling or fingering due to numbness of the fingers. (Tr. at 212.) Plaintiff would likely be absent from work more than four days per month. (Tr. at 213.)

Dr. Thomas–King reviewed the April 30, 2002 report and agreed with the limitations it contained on continuous sitting, standing and walking; total sitting, standing and walking during a workday; anticipated absenteeism; and gross and fine manual dexterity bilaterally. (Tr. at 215.)

Plaintiff returned to see Dr. King on May 1, 2002, with continuing low back and buttock pain. The previous injection provided 40–60% pain relief for two days. Dr. King administered another lumbar facet nerve block. (Tr. at 221.) Relief from this injection lasted only one day, so plaintiff returned for a third on May 15, 2002. (Tr. at 220.)

On June 3, 2002, plaintiff saw Dr. King, complaining of back pain. She rated her pain as 8/10 and stated that the pain duration had been increasing. The doctor continued her medication and advised her to continue physical therapy at Dr. Flowers's office. She was to return in two weeks for a lumbar facet injection. (Tr. at 251–52.)

Plaintiff returned to Dr. King on July 31, 2002, stating that her low back was not hurting but her shoulders were. (Tr. at 249.) She reported that her neck and shoulder pain worsened with physical activity and weather changes, especially cold and damp conditions. Dr. King's impression was low back pain secondary to lumbar facet syndrome, cervical facet syndrome, and suprascapular neuralgia. (Tr. at 249.) Plaintiff received a suprascapular nerve block injection (Tr. at 219) and was advised to continue with conservative therapy and use of Darvocet, Neurontin and Lidoderm patches. (Tr. at 250.)

On August 14, 2002, plaintiff returned to Dr. King complaining of right shoulder pain with decreased range of motion. She received a suprascapular nerve block. (Tr. at 218.) On August 30, 2002, plaintiff saw Dr. King complaining of continued right shoulder pain. The previous injection had provided 40–60% pain relief for two days. She received another right suprascapular nerve block. (Tr. at 217.)

Plaintiff received twice weekly physical therapy for her neck, back and shoulder at the Pain Management & Treatment Center in July 2002 (Tr. at 224), and from September 23, 2002 to October 23, 2002. (Tr. at 226–36.) The October 23 record noted that plaintiff was "slowly improving"

but her pain was still eight out of ten. (Tr. at 226.)

### 2. Consulting/Examining Sources

Plaintiff was examined by Dr. Ward Jankus at the behest of the Administration on or about May 14, 2001. Dr. Jankus noted that plaintiff's problems began with the December 1999 car accident, and that she had treated with Dr. Flowers until around January 2001 when insurance and monetary limitations forced her to stop. (Tr. at 188.) Plaintiff reported pain from the base of the cervical spine all the way down to the lumbosacral junction, which was essentially constant, averaging eight or nine out of ten in severity. She did not report radiation into the legs but did complain of posterior headaches. (Tr. at 188.)

Plaintiff estimated that she could walk, stand and sit about two hours before she had to change positions. Out of an eight hour period, she estimated that she could be on her feet about four hours. (Tr. at 188.) She estimated that she could lift 20 pounds. (Tr. at 189.) She stated that her hands bothered her every day, at times waking her up at night. She reported that her hands bothered her after writing for more than 15 or 20 minutes, and that it was hard to open jars or do repetitive activities such as stirring. (Tr. at 189.)

On examination, Dr. Jankus noted that plaintiff had full range of motion of the back and neck, could forward flex to 90 degrees, extend 30 degrees and lateral side bend 40 degrees bilaterally. On palpation, there was some tenderness but no muscle spasm was appreciated. She had full strength in the upper and lower extremities. (Tr. at 189.) Her gait was smooth, with no weakness in walking on heels or toes. (Tr. at 190.) She was able to use her hands adequately for light grasping and manipulating. Straight leg raising was negative bilaterally. (Tr. at 190.)

Dr. Jankus's impression was:

1. Cervical/thoracic/lumbar strain without obvious radiculopathy;

2. History of C5–6 focal disc herniation of unclear significance; and

3. History of carpal tunnel syndrome without denervation, left greater than right.

(Tr. at 190.) Due to plaintiff's complaints of mid-back pain, Dr. Jankus obtained a thoraco-lumbar spine x-ray, which was normal. (Tr. at 190–91.)

On May 30, 2001, reviewing physician Dr. Baumblatt prepared an RFC assessment for the Administration. (Tr. at 192.) He rated plaintiff's exertional limitations as follows: occasionally lift 50 pounds, 25 pounds frequently; stand and/or walk about six hours out of an eight hour day;[11] and push/pull in unlimited fashion. (Tr. at 193.) He opined that plaintiff had no postural, manipulative, visual, communicative and environmental limitations. (Tr. at 194–96.)

### D. ALJ's Decision

On April 21, 2003, the ALJ issued a decision denying plaintiff's application. The ALJ followed the five step sequential evaluation method. First, she found that plaintiff was presently unemployed and had performed no substantial gainful activity since December 7, 1999, the alleged disability onset date. (Tr. at 15.) Second, she found that plaintiff suffered from severe impairments—cervical radiculopathy, lumbar facet syndrome, headaches, a herniated disc, degenerative joint disease and carpal tunnel syndrome. However, at step three she found that none of these impair-

---

11. Dr. Baumblatt did not rate plaintiff's abili- ty to sit. (Tr. at 193.)

ments met or equaled any listed impairment. (Tr. at 14.)

At step four, the ALJ found, ostensibly in reliance on the July 2000 report of Dr. Flowers, that plaintiff retained the RFC for light work requiring no repetitive motion or vibration of the hands; no extremes of temperature and humidity; no repetitive motions, rotations or bending of the neck; and allowing occasional stooping and crouching. (Tr. at 14.) The ALJ rejected the more restrictive reports of Drs. Bhatti and Thomas–King, stating that there had been no real change in plaintiff's condition between the date of Dr. Flowers's report (July 2000) and the 2002 reports of Bhatti and Thomas–King. The ALJ also found plaintiff's subjective complaints less than credible based on: (1) the fact that plaintiff worked on a limited basis in 2000 and 2001; and (2) the fact that plaintiff had not recently treated for her carpal tunnel syndrome. (Tr. at 14.)

Based on this RFC, the ALJ concluded at step four that plaintiff could not perform her past work. (Tr. at 14.) However, relying on the testimony of the VE and using Grid Rules 202.18 and 202.29 as a framework for her decision, the ALJ found that there were a significant number of other jobs that plaintiff could perform—specifically, 1800 attendant/monitor jobs. Thus, she rejected plaintiff's claim at step five. (Tr. at 15.)

### E. Appeals Council Review and District Court Action

Plaintiff asked the Appeals Council to review the ALJ's decision (Tr. at 8), but on June 13, 2003 her request was denied. (Tr. at 4.) This action followed.

### III. DISCUSSION

Plaintiff alleges that the ALJ committed three errors requiring reversal: (1) the ALJ improperly evaluated the opinions of her treating physicians, Drs. Bhatti & Thomas–King; (2) the ALJ improperly evaluated the credibility of her testimony; and (3) the ALJ failed to assess her limitations on a function-by-function basis. The ultimate issues in any § 405(g) review are whether the ALJ's decision was supported by substantial evidence, whether the ALJ built an accurate and logical bridge from the evidence to the result, and whether the ALJ committed any errors of law.

### A. Evaluation of Treating Physician Opinions

█ Treating source opinions must be given special consideration in social security cases. *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). If well-supported by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with other substantial evidence, the adjudicator must afford such opinions controlling weight. *Id.* (citing SSR 96–8p); 20 C.F.R. § 404.1527(d)(2).

█ Even if the ALJ finds that the opinion is not entitled to controlling weight, she may not simply reject it. SSR 96–2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision." *Wates v. Barnhart*, 274

F.Supp.2d 1024, 1034 (E.D.Wis.2003) (quoting 20 C.F.R. § 404.1527(d)(2)).

In the present case, although she did not explicitly say so, the ALJ relied on the July 2000 report of Dr. Flowers in determining plaintiff's RFC. (Tr. at 14.) She rejected the more restrictive reports prepared by Drs. Bhatti and Thomas–King in April 2002, stating:

> [T]here has been no real change in the claimant's condition since August 2000, so there is no reason for a more restrictive assessment. In fact, [the] MRI of January 8, 2002 was termed normal with the exception of the prominent posterior osteophyte at C5–6, which does slightly narrow the spinal canal and does efface the thecal sac. There is no encroachment on the neural foramina. Claimant received nerve block injections in 2002 and reported good resolution of her low back pain. She also underwent a suprascapular nerve injection for [a] complaint of shoulder pain.

(Tr. at 14, internal citation omitted.)

Plaintiff alleges three errors in the ALJ's analysis: (1) the ALJ failed to cite inconsistent evidence in the record that would support her rejection of Drs. Bhatti's and Thomas–King's opinions; (2) the ALJ "played doctor" by interpreting bare clinical findings; and (3) the ALJ did not consider all of the factors set forth in 20 C.F.R. § 404.1527. However, before addressing these alleged errors, I must determine whether it is appropriate to consider Drs. Bhatti and Thomas–King "treating sources." The Commissioner states that there are no treatment notes from Dr. Bhatti, and that Dr. Thomas–King examined plaintiff briefly on only two occasions and gave her pain injections. Thus, the Commissioner argues that neither had the "longitudinal" treatment relationship required of a "treating source." *See* 20 C.F.R. § 404.1572(d)(2).

Plaintiff responds that this is an improper "post hoc" argument because the ALJ did not dispute that Drs. Bhatti and Thomas–King were treating sources.[12] *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir.2002) (stating that "principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ"; "the ALJ (not the Commissioner's lawyers) must build an accurate and logical bridge from the evidence to her conclusion"). I agree with plaintiff that where, as here, the ALJ declined to afford less weight to these doctors' opinions because of the length of time plaintiff treated with them, it would be inappropriate to treat their opinions as those of a mere "examining" or "non-treating" source.[13]

Moreover, there is evidence in the record supporting the ALJ's implicit conclusion that Dr. Thomas–King was a treating source. Pursuant to 20 C.F.R. § 404.1502:

> Treating source means your own physician, psychologist, or other acceptable

---

12. Neither did the ALJ disapprove Dr. Bhatti's April 30, 2002 assessment because it was apparently prepared by a physical therapist, then reviewed and signed by Dr. Bhatti. In any event, the Seventh Circuit has held that reports from physical therapists are entitled to consideration in social security cases. *Barrett v. Barnhart*, 355 F.3d 1065, ——, 2004 WL 99031, at *2 (7th Cir.2004).

13. In any event, the ALJ must still give such opinions reasonable consideration. *See* 20 C.F.R. 404.1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); *see also Moore v. Com'r of Soc. Sec. Admin., Barnhart*, 278 F.3d 920, 924 (9th Cir.2002) (stating that ALJ can only reject an examining physician's opinion for reasons supported by substantial evidence in the record).

medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

Dr. Thomas–King saw plaintiff on January 7, 2002 (Tr. at 263), January 24, 2002 (Tr. at 256–57) and February 2, 2002 (Tr. at 216). She also completed a report concerning plaintiff's functional capacity. (Tr. at 215.) Dr. King, who also worked at the Pain Management and Treatment Center, saw plaintiff on March 18, 2002 (Tr. at 223), April 1, 2002 (Tr. at 255), May 1, 2002 (Tr. at 220–21), June 3, 2002 (Tr. at 251–52), July 31, 2002 (Tr. at 249), August 14, 2002 (Tr. at 218), and August 30, 2002 (Tr. at 217). The notes generated by Dr. King

indicate that plaintiff "is a patient of Dr. Pamela Thomas–King's." (Tr. at 249, 251.) While this evidence does not show extensive treatment, I cannot conclude that it is insufficient under § 404.1502.

The evidence suggesting that Dr. Bhatti "treated" plaintiff is, as plaintiff admits, unclear. The treatment records from MFM Clinic, where Dr. Bhatti and Dr. Flowers worked, do not clearly identify the treating doctor on each visit. The records suggest that Dr. Flowers treated plaintiff through July 2000.[14] However, it appears that when plaintiff returned to MFM Clinic on December 27, 2001 her care was administered under the supervision of Dr. Bhatti. (Tr. at 269.)

In any event, based on the ALJ's assumption that Drs. Bhatti and Thomas–King were treating physicians, I will consider them as such. I turn now to the alleged errors in the ALJ's evaluation of their opinions.

### 1. Failure to Cite Inconsistent Evidence

█ Plaintiff notes that a treating source opinion must be accepted if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. She faults the ALJ for failing to identify any inconsistent evidence that supported her rejection of Drs. Bhatti's and Thomas–King's opinions. However, the ALJ did contrast those reports with other inconsistent evidence—the report of treating source Dr. Flowers. (Tr. at 14.) Dr. Flowers imposed less severe restrictions than did Drs. Bhatti and Thomas–King. *See Johansen v. Barnhart,*

---

**14.** Plaintiff suggests that the initials "AB" on a January 6, 2000 note may refer to Dr. A. Bhatti. (Tr. at 171.) Those initials appear twice on the form: once under what appears to be a scrawled signature at the end of the notes and once following the words "Patient Initials." It is unclear whether the first set of initials refers to Dr. Bhatti or plaintiff—Andra Brown. The second set of initials would seem to refer to plaintiff.

314 F.3d 283, 287–88 (7th Cir.2002) (affirming ALJ's refusal to give controlling weight to treating source opinion which was contradicted by the earlier opinions of treating physicians, as well as that of consultative physician).

The ALJ also stated that the opinions of Drs. Bhatti and Flowers were not credible because there had been no real change in plaintiff's condition after Dr. Flowers last examined her in July 2000. This leads to plaintiff's second complaint about the ALJ's evaluation of the treating source opinions.

## 2. Interpretation of Bare Clinical Findings

 Plaintiff argues that the lay ALJ relied on her own interpretations of the January 8, 2002 MRI and thus "played doctor" in order to reject the assessment of Drs. Bhatti and Thomas–King. However, the ALJ did not interpret the MRI; she simply paraphrased the impression of Dr. Lawson, who reviewed the MRI. (*Compare* Tr. at 14 *with* Tr. at 262.) While ALJs are forbidden to play doctor and make their own medical findings, they must discuss and weigh the medical evidence.

 The ALJ cited the MRI to support her finding that the objective medical evidence did not demonstrate a worsening of plaintiff's condition between the date of Dr. Flowers's report and the reports of Drs. Bhatti and Thomas–King. The ALJ was obligated to determine whether the reports of Drs. Bhatti and Thomas–King were well-supported by medically acceptable clinical and laboratory diagnostic techniques. If the objective evidence, including MRI results, did not demonstrate a worsening of plaintiff's condition such that additional restrictions were necessary, this would support a decision to credit the report of Dr. Flowers over that of Drs. Bhatti and Thomas–King.

Two MRIs of plaintiff's cervical spine appear in the record. The first was performed on June 21, 2000 by Dr. Popovich. His impression was: "Focal predominantly central disc herniation between C5 and C6 with subtle impression upon the spinal cord. No evidence of other significant pathology involving cervical spine." (Tr. at 163.) The second MRI was performed by Dr. Lawson on January 8, 2002. His impression was: "Normal cervical spine MRI with the exception of the prominent posterior osteophyte at C5–6 which does slightly narrow the spinal canal and does efface the thecal sac. No encroachment on the neural foramina." (Tr. at 262.) The ALJ could reasonably conclude that the January 2002 MRI, performed at the request of Dr. Thomas–King, did not demonstrate a worsening of plaintiff's condition since the June 21, 2000 MRI requested by Dr. Flowers.

## 3. Discussion of § 404.1527(d) Factors

 Finally, plaintiff argues that the ALJ failed to discuss all of the factors set forth in 20 C.F.R. § 404.1527(d). Section 404.1527(d) sets forth the factors the ALJ must consider in evaluating a medical opinion that does not meet the test for controlling weight. Those factors are:

1. length of the treatment relationship and the frequency of examination;

2. nature and extent of the treatment relationship;

3. supportability (the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight is given to that opinion);

4. consistency (the more consistent an opinion is with the record as a whole, the more weight it is given);

5. specialization (more weight is given to the opinion of a specialist about medical issues related to that source's specialty); and

6. other factors (those factors which tend to support or contradict an opinion).

Plaintiff contends that failure to articulate findings with respect to each factor constitutes reversible error. However, plaintiff overstates the cases she cites in support of this proposition. In *Dominguese*, this court held that the ALJ "must *evaluate* the opinion's weight by looking at the length, nature and extent of the plaintiff and physician's treatment relationship, the degree to which the opinion is supported by evidence, the opinion's consistency with the record as a whole, whether the doctor is a specialist, and 'other factors.'" 172 F.Supp.2d at 1100 (quoting 20 C.F.R. § 404.1527(d)) (emphasis added). I did not impose an *articulation* requirement for each and every factor. *Accord Lopez–Navarro v. Barnhart*, 207 F.Supp.2d 870, 885 (E.D.Wis.2002). Neither did *Raub v. Barnhart*, No. 01–C–8283, 2002 WL 1793744, at *8 (N.D.Ill. Aug.15, 2002) (reversing where ALJ "failed to provide any explanation with respect to the factors that are to be used in determining the weight given to a treating

physician's opinion when it is not given controlling weight"). ALJs are not required to produce prolix opinions containing checklists from all of the regulations. *See Clay v. Apfel*, 64 F.Supp.2d 774, 781 (N.D.Ill.1999) ("SSR 96–7p ... does not require an ALJ to analyze and elaborate on each of the seven factors set forth when making a credibility determination."). Rather, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *see also Diaz*, 55 F.3d at 309; *Wates*, 274 F.Supp.2d at 1040.

▪ Nevertheless, the ALJ's opinion in the present case leaves unmentioned a great deal of evidence which could bear upon her conclusion that plaintiff's condition did not worsen between July 2000 and April 2002, and thus upon her evaluation of Drs. Bhatti's and Thomas–King's reports. The treatment records created after plaintiff's July 2000 discharge by Dr. Flowers contained numerous references to plaintiff's condition worsening. While the Commissioner is correct that much of this evidence consists of or is based upon plaintiff's subjective complaints (*See* Tr. at 25, 68, 73,[15] 185,[16] 217, 219, 251, 263 [17], 269 [18]), the ALJ was not allowed to simply ignore it. Physicians are entitled to rely on their

15. In her July 26, 2001 request for reconsideration plaintiff said that her "condition is steadily getting worse." (Tr. at 25.) In her July 27, 2001 Reconsideration Disability Report she said "I have experienced more pains in my arms, hands, and back." (Tr. at 68.) She later said in the same report, "the pain is getting worse." (Tr. at 73.)

16. Plaintiff returned to MFM Clinic on August 8, 2000 after she had been released by Dr. Flowers, complaining of increased back pain. (Tr. at 185.)

17. When plaintiff first saw Dr. Thomas–King on January 7, 2002, she reported "worsening symptoms over the last several months." (Tr. at 263.) On June 3, 2002, July 31, 2002 and August 30, 2002, plaintiff told Dr. King that her pain was getting worse. (Tr. at 217, 219, 251.)

18. On returning to MFM Clinic on December 27, 2001, plaintiff complained of severe back pain that had required multiple visits to the ER. (Tr. at 269.)

patients' descriptions of their conditions. *Samuel v. Barnhart*, 295 F.Supp.2d 926, 950 (E.D.Wis.2003). A " 'patient's report of complaints, or history, is an essential diagnostic tool.' " *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir.2003) (quoting *Flanery v. Chater*, 112 F.3d 346, 350 (8th Cir.1997)). Of course, the ALJ was entitled to reject plaintiff's subjective complaints (and thus the doctors' reports relying thereon), but only if she followed the Commissioner's regulations. This brings us to plaintiff's second allegation of error.[19]

## B. Evaluation of Plaintiff's Credibility

Generally, the court must defer to the ALJ's credibility determination because the ALJ had the opportunity to personally observe the claimant at the hearing. *Wates*, 274 F.Supp.2d at 1038; *see also Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 541 (7th Cir.1992). However, when the ALJ's credibility determination rests on objective factors rather than subjective considerations such as a claimant's demeanor, appellate courts have greater freedom to review the ALJ's decision. *Wates*, 274 F.Supp.2d at 1038 (citing *Clifford*, 227 F.3d at 872). Further, the court need not defer to a credibility determination based on a mis-

understanding or one-sided view of the evidence. *Id.* Finally, the ALJ must comply with the Commissioner's Rulings and Regulations in evaluating credibility. *Id.*

In the present case, the ALJ rejected plaintiff's testimony with the following analysis:

> In assessing the claimant's credibility in regard to her allegation that she is disabled, the undersigned calls attention to the fact that the claimant was able to work on a limited basis in 2000 and 2001. While these earnings do not rise to the level of substantial gainful activity, this work is an indication of the ability to perform some physical activities. Also, the undersigned notes that the claimant has not received recent treatment for carpal tunnel syndrome, calling into question the extent this condition troubles the claimant.

(Tr. at 14.)

The ALJ's decision included a reference to the factors she was to consider in determining the effect of pain and other subjective complaints (Tr. at 13, ¶ 2, citing 20 C.F.R. § 404.1529) and a brief recitation of plaintiff's complaints (Tr. at 13, ¶ 4), but no evaluation of the relevant factors or how plaintiff's complaints impacted upon her claim. This was error. The case law and

---

**19.** The ALJ's primary reason for rejecting Drs. Bhatti's and Thomas–King's opinions was the absence of evidence suggesting a worsening of plaintiff's condition from July 2000 to April 2002. I evaluate this reason in the next section of this decision. The ALJ also stated that plaintiff "received nerve block injections in 2002 and reported good resolution of her low back pain." (Tr. at 14.) The record does not support this characterization. Plaintiff received an injection to the lumbar area from Dr. King on April 3, 2002. (Tr. at 222.) When she returned on May 1, 2002, she reported continuing low back and buttock pain. The previous injection had provided only 40–60% pain relief for just two days. Dr. King thus administered another injection.

(Tr. at 221.) However, relief from this injection lasted just one day, requiring plaintiff to return for a third injection on May 15, 2002. (Tr. at 220.) When plaintiff saw Dr. King on June 3, 2002, she still complained of back pain, rated as 8/10, with increased duration. (Tr. at 251.) Although plaintiff complained primarily of shoulder rather than back pain when she next saw Dr. King on July 31, 2002 (Tr. at 249), the above-referenced portions of the record refute the ALJ's statement. The ALJ also said that plaintiff "underwent a suprascapular nerve injection for complaint of shoulder pain." (Tr. at 14.) The record shows that such injections were administered (Tr. at 217–18), but the ALJ fails to explain the significance.

regulations contain clear directives to ALJs on this issue.

The Seventh Circuit has held:

> In evaluating a claimant's subjective complaints of pain, the ALJ must first determine whether the pain alleged is substantiated by objective medical evidence. 20 C.F.R. § 404.1529. If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. Social Security Ruling 88–13, ("SSR 88–13"). She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties. SSR 88–13. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.

*Luna*, 22 F.3d at 691.

SSR 96–7p further provides:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.
>
> Once the adjudicator has determined the extent to which the individual's symptoms limit the individual's ability to do basic work activities by making a finding on the credibility of the individual's statements, the impact of the symptoms on the individual's ability to function must be considered along with the objective medical and other evidence, first in determining whether the individual's impairment or combination of impairments is "severe" at step 2 of the sequential evaluation process for determining disability and, as necessary, at each subsequent step of the process.

Regarding the assessment of credibility, SSR 96–7p states:

> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.
>
> The finding on the credibility of the individual's statements cannot be based

on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

The Seventh Circuit requires ALJs to comply with SSR 96–7p. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir.2003); *see also Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir.2003).

In the present case, pain was a primary component of plaintiff's claim. Thus, the ALJ was required to evaluate the factors set forth in *Luna* and SSR 96–7p. She did not. In fact, the ALJ failed to discuss *any* of the specific factors set forth in SSR 96–7p or 20 C.F.R. § 404.1529. As noted above, an ALJ's decision need not necessarily include a checklist from every applicable regulation or SSR, so long as it is clear that the ALJ considered the relevant

factors. However, in the present case, the ALJ failed to evaluate any of the relevant factors and her decision leaves me with serious doubts that they were considered. *See Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir.2003) (reversing where ALJ "failed to apply the factors for evaluating symptoms set forth in Social Security Ruling 96–7p").

For example, the ALJ nowhere mentions plaintiff's daily activities or her testimony concerning "good days" and "bad days." Because the ability to work includes the ability to do sustained work activities on a regular and continuing basis, SSR 96–8p, plaintiff's alleged inability to function on certain days should have been considered. *See Gotz v. Barnhart*, 207 F.Supp.2d 886, 897 (E.D.Wis.2002).

Also significant is the ALJ's failure to discuss the side effects of plaintiff's medication. At one point plaintiff stated that her medications created "a 'drugged' state" causing her to "function in slow motion." (Tr. at 72.) At the hearing she stated that the medications made her "drowsy." (Tr. at 282.) The record contains portions of *Appleton & Lange's 1999 Drug Guide*, which indicate that plaintiff's medications have common side effects of drowsiness and dizziness (Tr. at 240–42), thus corroborating plaintiff's assertions.[20]

The side effects of medication can significantly affect an individual's ability to work and, if the record contains evidence of side effects, should figure in the disability determination process. *See, e.g., Porch v. Chater*, 115 F.3d 567, 572 (8th Cir.1997). Courts have condemned ALJs for failing to consider such evidence when it was potentially relevant to the claimant's ability to

**20.** Plaintiff also reported to Dr. King that the Neurontin was causing her to feel fatigued.

(Tr. at 255.)

work.[21] In *Beckley v. Apfel,* 152 F.3d 1056, 1060 (8th Cir.1998), the court reversed where the ALJ "failed to consider the dosage, effectiveness, and side effects of Beckley's medications, in spite of her testimony that the medications made her 'woozy' and 'silly.'" In *Silva,* 2003 WL 22425010, at 8, 2003 U.S. Dist. LEXIS 19002, at *27, the court reversed the ALJ's credibility determination, stating: "Under SSR 96–7p, the adjudicator must consider 'the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms.' SSR 96–7p, 1996 WL 374186 at *3. Here the ALJ's opinion fails to reflect any consideration of the side effects of the many medications that Plaintiff takes." *See also Noyd v. Barnhart,* No. 01–C–15, 2002 WL 1559708, at *17118 (N.D.Ill. July 9, 2002), 2002 U.S. Dist. LEXIS 12735, at *53–54 (reversing where ALJ rejected plaintiff's complaints of pain without complying with SSR 96–7 and considering side effects of medication).

As the court noted in *McKenzie v. Heckler,* 589 F.Supp. 1152, 1158 (N.D.Ill.1984):

> While the effects of medication standing alone would not support a disability finding, the ALJ's failure to consider such testimony, in conjunction with the other

evidence, is also error. *Schmoll v. Harris,* 636 F.2d 1146 (7th Cir.1980). The ALJ rejected subjective symptoms in a conclusory manner as merely "not credible" giving no explanation or making any finding for such rejection. *Szulyk v. Heckler,* 575 F.Supp. 1266, 1269 (N.D.Ill.1984); *Holndoner v. Schweiker,* 542 F.Supp. 739 (N.D.Ill.1982). When the ALJ fails to mention rejected evidence, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored. *Zblewski v. Schweiker,* 732 F.2d 75 (7th Cir.1984).

The fact that important evidence went unmentioned here leaves me unable to tell whether it was even considered, and therefore unable to uphold the ALJ's determination.[22]

Moreover, neither of the two reasons the ALJ provided for rejecting plaintiff's complaints can withstand scrutiny. The ALJ first said that plaintiff had returned to work in 2000 and 2001. (Tr. at 14.) This is true, but the ALJ ignored plaintiff's testimony that she was forced to leave each position due to pain. The ALJ must consider all of the evidence, not just that which supports her position. *See Dominguese,* 172 F.Supp.2d at 1099 ("The

---

**21.** In *Herron,* the Seventh Circuit held that ALJs need not make specific findings concerning the side effects of prescription drugs on the claimant's ability to work. *Herron,* 19 F.3d at 335. Rather, omission of any discussion of this factor is considered in evaluating whether the decision is supported by substantial evidence. *See id.* However, *Herron* does not excuse the ALJ's omission here. "SSR 96–7p was issued in 1996, after the *Herron* decision, which was rendered in 1994." *Silva v. Barnhart,* No. 02–C–5681, 2003 WL 22425010, at *8 (N.D.Ill. Oct.23, 2003), 2003 U.S. Dist. LEXIS 19002, at *26. SSR 96–7p requires ALJ to consider such evidence. In the present case, the ALJ's decision fails to reflect any consideration of this evidence. In decisions rendered after 1996, the Seventh Circuit has held that "an ALJ must comply

with the requirements of Social Security Ruling 96–7p." *Brindisi,* 315 F.3d at 788 (citing *Steele,* 290 F.3d at 942).

**22.** The Commissioner concedes that the ALJ failed to discuss side effects of medication, but states that Dr. Flowers should have been aware of any side effects and presumably considered them in setting plaintiff's restrictions. This is a post hoc argument, which I cannot accept. Further, it appears that Dr. Flowers prescribed Motrin, Hydrocodone/Vicodin and Valium (Tr. at 170–71, 175, 178, 179); the medications that apparently caused the problematic side effects—Neurontin and Darvocet—were prescribed later by Drs. Thomas–King and King. (*E.g.,* Tr. at 264.)

ALJ here did not even mention plaintiff's other relevant testimony, let alone give reasons for the weight he accorded it. As a result, his decision did not comport with the ruling's instruction, leaving reviewing courts to guess at his path of reasoning."). In any event, as the Seventh Circuit has noted, "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job. One can be unemployable, yet employed." *Wilder v. Apfel,* 153 F.3d 799, 801 (7th Cir.1998) (internal citations omitted). The record in the present case suggests that while plaintiff worked for a brief time because she needed the income and the benefits, she did not "perform[ ] up to standards" and was "afraid of being fired because of [her] poor performance." (Tr. at 73.)

The ALJ's second reason for rejecting plaintiff's testimony was that plaintiff had "not received recent treatment for carpal tunnel syndrome, calling into question the extent this condition troubles the claimant." (Tr. at 14.) While it was reasonable for the ALJ to consider conservative treatment in assessing the severity of this condition, the observation lends little or nothing to the ALJ's ultimate conclusion that plaintiff's complaints were not credible. First, plaintiff testified to pain in her neck, back and head, as well as her hands. (Tr. at 280–81.) She also stated that she used medication for her hand pain. (Tr. at 280.) This testimony was unmentioned by the ALJ. Second, the ALJ failed to cite any medical evidence concerning what sort of treatment plaintiff should have been pursuing.[23] *See Dominguese,* 172 F.Supp.2d

at 1096 ("In the absence of such evidence, the ALJ made his own independent medical determination about the appropriateness of doctor visits. This determination was not within the ALJ's province to make."). Finally, the ALJ failed to consider any reasons for plaintiff's lack of treatment. This was another violation of SSR 96–7p, which provides in pertinent part:

The adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

*See also Herron,* 19 F.3d at 336 n. 11 ("Lack of discipline, character, or fortitude in seeking medical treatment is not a defense to a claim for disability benefits."); *Thompson v. Sullivan,* 987 F.2d 1482, 1489–90 (10th Cir.1993) (remanding where claimant failed to pursue medical treatment because ALJ did not consider whether medical treatment was prescribed, was refused by claimant, would restore the claimant's ability to work, or any other justifiable excuse for the claimant's failure to obtain treatment); *cf.* SSR 82–59.[24] Thus, neither of the reasons provided by

---

**23.** In his final report, Dr. Flowers said: "Prosthesis and orthotics will include wrist splints for the use of her hands and the carpal tunnel syndrome" (Tr. at 182.) He opined that she "may require orthopedic evaluation of her carpal tunnel syndrome," but listed no

other future medical care related to this condition. (Tr. at 182.)

**24.** Also worth noting is the evidence that plaintiff was unable to obtain medical treatment for an extended period of time due to lack of funds and insurance. (Tr. at 188.)

the ALJ is sufficient to reject all of her complaints.

The ALJ's credibility determination was contrary to SSR 96–7p, was not supported by substantial evidence, and was insufficiently explained. Therefore, the decision must be reversed and the matter remanded. *See Golembiewski,* 322 F.3d at 916.

## C. RFC Determination

■ Plaintiff's final argument is that the ALJ failed to assess her RFC on a function-by-function basis. Plaintiff's argument is that (1) SSR 96–8p requires a narrative discussion describing how the evidence supported each conclusion in the RFC determination and how any material inconsistencies in the evidence were resolved; (2) SSR 96–2p and 96–5p provide that a treating source statement may contain medical opinions about several issues, and it may be necessary for the ALJ to decide whether to adopt each separate opinion; and (3) in her case, the ALJ failed to specifically address certain limitations imposed by Drs. Bhatti and Thomas–King, which Dr. Flowers did not address. These limitations are: the need for multiple, unscheduled rest breaks; impaired attention, concentration and work stress tolerance; impairment related absenteeism of more than four days per month; and limitations on sitting, standing and walking.[25] (Tr. at 209–13.) The VE testified that each of these limitations would preclude employment. (Tr. at 299–301.) Plaintiff contends that by failing to independently discuss them the ALJ violated the SSRs. I agree.

The D.C. Circuit Court of Appeals recently reversed an ALJ's decision based on a similar error. *Butler v. Barnhart,* 353 F.3d 992 (D.C.Cir.2004). The court first set forth the applicable law:

> The ALJ's RFC assessment bears on [the plaintiff's] ability to perform past relevant work (step four) and her ability to do "other work" (step five). 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f); *id.* §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii). It is designed to determine the claimant's uppermost ability to perform regular and continuous work-related physical and mental activities in a work environment. *Id.* §§ 404.1545(a)(1), 416.945(a)(1); *see also* Social Security Ruling (SSR) 96–8p, Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *2-*3 (SSA July 2, 1996). In effect, it is a "function-by-function" inquiry based on all of the relevant evidence of a claimant's ability to do work and must contain a "narrative discussion" identifying the evidence that supports each conclusion. SSR 96–8p, 1996 WL 374184, at *3, *7; *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In performing the RFC assessment, the ALJ must explain how he considered and resolved any "material inconsistencies or ambiguities" evident in the record, as well as the reasons for rejecting medical opinions in conflict with the ultimate RFC determination. SSR 96–8p, 1996 WL 374184, at *7.

*Id.* at 1000.

In *Butler,* the ALJ rejected the opinion of a treating source that the plaintiff could not lift, reach or stoop, relying on the opinions of other medical experts. However, "the other medical opinions on which the ALJ purportedly relied [did] not address Butler's ability to stoop." *Id.* at

---

25. I note that these limitations were set by Dr. Bhatti. Dr. Thomas–King concurred with Dr. Bhatti's limitations on continuous sitting, standing and walking; total sitting, standing and walking during a workday; anticipated absenteeism; and gross and fine manual dexterity bilaterally. (Tr. at 215.)

1001. Thus, the ALJ had failed to resolve material inconsistencies in the record and to provide an adequate reason for rejecting the treating source opinion. *Id.* at 1001–1002.

In the present case, the ALJ rejected the opinions of Drs. Bhatti and Thomas–King primarily because they varied from that of Dr. Flowers. But Dr. Flowers did not express any opinion on several of the issues raised in Drs. Bhatti's and Thomas–King's reports. It may be that Dr. Flowers did not foresee any limitations regarding those areas, but the ALJ made no such finding, and I cannot assume that to be the case. The ALJ thus failed to adequately state the reasons for rejecting medical opinions in conflict with the ultimate RFC determination, and SSR 96–8p compels a remand for clarification.[26] On remand, the ALJ must evaluate all treating source opinions under the standards set forth in 20 C.F.R. § 404.1527(d), SSR 96–8p and SSR 96–2p.

On remand, the ALJ must also consider plaintiff's testimony concerning pain and other non-exertional limitations in determining RFC. She must evaluate plaintiff's ability to do sustained work activity on a regular and continuing basis. SSR 96–8p. This will include consideration of plaintiff's "good days" and "bad days." As the court stated in *Silva:*

> [T]he ALJ did not state whether his RFC constitutes an assessment of what Plaintiff can do on her best days, her worst days, or some hybrid of the two. Nor did the ALJ make a finding as to how often Plaintiff has bad days. *See Gotz v. Barnhart,* 207 F.Supp.2d 886, 897 (E.D.Wis.2002) ("The ALJ must de-

termine the frequency of Plaintiff's 'bad days' and decide if their occurrence precludes full time work."). While the ALJ found the testimony of Plaintiff and her sister regarding her limitations to be "not fully substantiated," the court cannot infer from this a conclusion that the ALJ found that Plaintiff had no "bad days" or that she is able to perform at the RFC found by the ALJ on a regular and continuing basis. An ALJ must rationally articulate his conclusions, regardless whether there is sufficient evidence in the record to support his decision. *See Steele,* 290 F.3d at 941. Moreover, to the extent that the ALJ's determination of Plaintiff's capacity was based on his disregard of her testimony, the determination cannot be sustained because the ALJ's credibility finding was insufficient. On remand the ALJ will thus need to reevaluate Plaintiff's RFC in light of his revised credibility finding and SSR 96–8p.

2003 WL 22425010, at *10, 2003 U.S. Dist. LEXIS 19002, at *30–31.

The ALJ will then be required to reconsider her step five determination in light of an RFC finding based on all of the evidence. *See Griffin v. Massanari,* No. 00–C–7109, 2001 WL 1064476, at *9 (N.D.Ill. Sept.13, 2001), 2001 U.S. Dist. LEXIS 14280, at *31 ("The ALJ's failure to offer a rationale is material because the credibility findings are central to the step 5 decision regarding whether Mr. Griffin has the RFC to perform a limited range of light work. The VE testified that if Mr. Griffin was unable to concentrate or became so dizzy that he would have to miss work for one hour each day or a single day each

---

**26.** The Commissioner's only response to this argument is that because the ALJ properly found that Drs. Bhatti's and Thomas–King's reports were entitled to little weight there was no reason to include their restrictions in the

RFC finding. However, SSR 96–5p does not allow wholesale disallowance of a treating source statement. Rather, the ALJ should consider each opinion expressed therein.

week, in addition to normal breaks, then the already limited range of light work that Mr. Griffin could perform with his exertional limitations would be entirely eliminated (R. 61–62).").

## IV. CONCLUSION

For the reasons stated, the ALJ's decision must be reversed. Plaintiff requests remand for an award of benefits or, in the alternative, further proceedings. Generally, a judicial award of benefits is proper only when all essential factual issues have been resolved and the record clearly establishes that the plaintiff is entitled to benefits. *See, e.g., Faucher v. Sec'y of HHS,* 17 F.3d 171, 176 (6th Cir.1994); *Campbell v. Shalala,* 988 F.2d 741, 744 (7th Cir.1993). In the present case, the record does not conclusively show that plaintiff is disabled. Further, the primary bases for reversal are the failure of the ALJ to consider certain evidence and to comply with the SSRs. The appropriate remedy is a remand for further proceedings so that ALJ may properly adjudicate the application in the first instance.

**THEREFORE, IT IS ORDERED THAT** the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.