William LECHNER, Plaintiff,

v.

Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.

No. 03–C–1425.

United States District Court, E.D. Wisconsin.

June 14, 2004.

David Traver, for Plaintiff.

Nora Barry, for Defendant.

### *DECISION AND ORDER*

ADELMAN, District Judge.

Plaintiff William Lechner brings this 42 U.S.C. § 405(g) action seeking judicial review of the decision of defendant JoAnne Barnhart, Commissioner of the Social Security Administration, denying his application for supplemental security income (SSI) under the Social Security Act. Plaintiff alleged that he was disabled due primarily to mental illness. His application was denied by the Administration initially and on reconsideration, thus, plaintiff sought and obtained a hearing before an Administrative Law Judge (ALJ). However, the ALJ also concluded that plaintiff was not disabled. When the Appeals Council denied plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner. *See Gudgel v. Barnhart,* 345 F.3d 467, 468 (7th Cir. 2003).

Plaintiff asks that I reverse the ALJ's decision and remand the matter either for an award of benefits or further proceedings. The Commissioner argues that the decision must be affirmed. The matter has been fully briefed and is ready for decision.

## I. APPLICABLE LEGAL STANDARDS

### A. Disability Standard

In order to obtain benefits under the Social Security Act, plaintiff must be disabled, that is, he must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). He must show that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Administration has adopted a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520. The first step is to determine whether the claimant is presently engaged in substantial gainful activity (SGA). If not, the ALJ moves on to the second step, which is to determine whether the claimant has a "severe" impairment or combination of impairments. An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant has a severe impairment, the ALJ must determine at step three whether any of the claimant's impairments are listed by the Administration as being so severe as to preclude SGA. These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings"). If the claimant can demonstrate a listed impairment, he will be found disabled.

The Listings of mental impairments consist of three sets of "criteria": the para-graph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings). The paragraph A criteria substantiate medically the presence of a particular mental disorder. The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform SGA. If a claimant satisfies the A and B, or A and C criteria, he will be considered disabled. *Wates v. Barnhart,* 274 F.Supp.2d 1024, 1036 (E.D.Wis.2003) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00); *see also* 20 C.F.R. § 404.1520a (detailing evaluation of mental impairments).

If the claimant's impairment does not meet or equal a Listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC"). RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96–8p. The relevant mental work activities include understanding, remembering, and carrying out instructions; responding appropriately to supervision and co-workers; and handling work pressures in a work setting. 20 C.F.R. § 404.1545(c).

At step four, the ALJ must determine whether, given his RFC, the claimant can perform his past work. If so, he is not disabled. If not, the ALJ must move on to step five and determine whether the claimant is able to perform any other work in the national economy in light of his age, education and work experience. *E.g., Samuel v. Barnhart,* 295 F.Supp.2d 926, 929 (E.D.Wis.2003).

The burden is on the claimant to present the requisite proof at steps one through four. However, if the claim proceeds to step five, the burden shifts to the Adminis-

tration to establish that the claimant can engage in some other type of substantial gainful employment. The Administration may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of his limitations, or through the use of the "Medical–Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the ALJ may not rely on the Grid to deny a claim if the person's attributes do not correspond precisely to a particular rule, or if non-exertional limitations (e.g., pain, or mental, sensory or skin impairments) might substantially reduce the applicant's range of work. In such a case, the ALJ must solicit the testimony of a VE, although she may use the Grid as a "framework" for making a decision. *E.g., Samuel,* 295 F.Supp.2d at 929.

**B. Standard of Review of ALJ's Decision**

Under § 405(g), a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. However, the court's review of the ALJ's the decision is limited, and the ALJ's factual findings must be upheld if supported by substantial evidence. 42 U.S.C. § 405(g); *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable person would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Sec'y of Health & Human Servs.,* 957 F.2d 386, 388–89 (7th

Cir.1992). The court must review all the evidence in the record, and such review "must be more than an uncritical rubber stamp." *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984).

Nevertheless, it is the ALJ who has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

■ If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d 1271, 1274 (7th Cir.1989). The ALJ commits such an error if she fails to comply with the Commissioner's regulations and rulings. *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991).

■ The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, she must provide at least a glimpse into her reasoning. *Zurawski v. Halter,* 245 F.3d 881, 889 (7th Cir.2001). Regardless of the volume of evidence in support of the decision, the court cannot uphold it if the reasons given by the ALJ "do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater,* 78 F.3d 305, 307 (1996). Finally, ALJs "must not succumb to the temptation to

play doctor and make their own independent medical findings." *Rohan*, 98 F.3d at 970. "The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Administrative Decisions

Plaintiff applied for SSI on August 10, 1999.[1] (Tr. at 82.) He alleged that he was unable to work because he would "blank out 100 times a day" and had a "bad left knee, bad back, [and] 3erd [sic] grade level [education]." (Tr. at 86.) The application was denied initially on October 28, 1999 (Tr. at 62) based on the determination that plaintiff's physical problems did not limit his functioning and his mental problems were not severe enough to preclude unskilled work (Tr. at 64). Plaintiff requested reconsideration on December 16, 1999 (Tr. at 68), but his request was denied on August 23, 2000 (Tr. at 63). On October 24, 2000, plaintiff requested a hearing (Tr. at 75), and on November 6, 2001 he appeared before ALJ Marsha Stroup. (Tr. at 40.)

### B. Hearing Testimony

Plaintiff and VE Les Goldsmith were the only witnesses at the hearing. Plaintiff was represented by counsel. (Tr. at 36.)

#### 1. Plaintiff's Testimony

Plaintiff testified that he was 47 years old, unmarried, and lived with his 18 year-old "step-daughter"[2] and her three year old child. (Tr. at 44.) He stated that he had completed the 9th grade in school, where he was enrolled in special education classes. (Tr. at 45.) He testified that while he did not read very well, he was able to understand the hearing notice. (Tr. at 45.)

Plaintiff testified that he was last employed in the 1970s, washing dishes and working for a manufacturing company. He stated that he was unable to hold these jobs because he could not follow instructions or remember what he was doing and made mistakes. He testified that he lived with his parents until 1984, when he moved in with his girlfriend. (Tr. at 48–49.) He indicated that he lived with his girlfriend, who helped him financially, until one year prior to the hearing when she passed away. (Tr. at 49.)

Plaintiff said that he supported himself via various welfare programs, such as energy assistance and church food programs. (Tr. at 46.) He admitted that he had abused drugs and alcohol in the past but denied any current use. He also denied any police contacts in the last ten years. (Tr. at 46–47.)

Plaintiff described an average day as follows: he would get up in the morning, sit around for awhile, and have a cup of coffee. By then it would be 10:30 or 11:00. He would watch some television, then try to get out, visiting a friend or going to a gas station. He would then return home and watch television or "[f]iddle around a little bit." (Tr. at 47.) When it was warm, he walked his dog. (Tr. at 49.) He stated that he had a few friends, whom he saw a few times per week. (Tr. at 53.) However, he testified that he mostly kept to himself. (Tr. at 57.)

Plaintiff stated that he had trouble sleeping but prescription Ambien helped.

---

**1.** The record refers to a prior application, which was denied on April 2, 1998, but contains no other information concerning it. (Tr. at 95.)

**2.** Plaintiff stated that the woman he lived with was the daughter of his deceased girlfriend, whom he considered to be his step-daughter. (Tr. at 44–45.)

(Tr. at 49.) He stated that he did some things around the house, such as picking up his step-daughter's child's things. However, his step-daughter did most of the laundry, and plaintiff cooked only when he felt like it. (Tr. at 50.) He stated that he sometimes had trouble caring for himself. He admitted that he had last showered three weeks before the hearing and that he shaved "[e]very once in awhile." (Tr. at 51.) He testified that his step-daughter sometimes told him he needed to take a bath and agreed that he was "pretty grungy" at the hearing. (Tr. at 52.)

Plaintiff testified that he used to think people were out to get him "but not too much anymore." (Tr. at 52.) He denied presently having hallucinations but indicated that he did experience them in the past. (Tr. at 55.) He testified that he experienced "blank out or blackouts"—which he likened to a lapse of concentration—about 100 times per day. (Tr. at 56.) He stated that he was taking Zoloft and Zyprexa for depression, which "seem[ed] to mellow things out." (Tr. at 53.) He stated that he used to see his psychiatrist every two weeks, then it was cut back to monthly, then every three months. (Tr. at 54.) Plaintiff testified that he also took medication for pain in his back, neck and shoulders, which he believed was due to arthritis. (Tr. at 54.)

### 2. VE Testimony

VE Goldsmith testified that plaintiff had no gainful employment in the past 20 years. (Tr. at 58.) The ALJ then asked the VE if there were jobs available in Wisconsin for someone limited to simple (SVP's of one or two),[3] repetitive, low stress work, with no public contact. Goldsmith opined that the person could work as a cleaner/janitor, with 65,000 such positions existing in the state of Wisconsin. He also opined that the person could work as a light assembler, with 25,000 such positions available in Wisconsin. (Tr. at 58–59.) However, Goldsmith testified that if the person came to work looking like plaintiff did at the hearing, i.e. unclean, his supervisor would send him home. He also stated that if the person had no ability to remember work-like instructions, both jobs would be eliminated. (Tr. at 59.) If the person had trouble maintaining attention for more than two hours at a time, the work would also be precluded. (Tr. at 59.) Goldsmith testified that even with these jobs a person would have to be able to think independently, and so an inability to make simple work-related decisions would eliminate the work. (Tr. at 59–60.) Goldsmith stated that an absenteeism rate of one or two days per month would be the most that would be tolerated. (Tr. at 60.)

### C. Medical Evidence

#### 1. Treating/Examining Sources

Plaintiff was seen at the Charter Counseling Center from February through August 1999 on referral from the MCMHD[4] because he was experiencing "black outs" 10–20 times per day. (Tr. at 138–46.) This was apparently the first time he had sought psychiatric treatment.[5] (Tr. at 141.)

---

**3.** "SVP" stands for "Special Vocational Preparation." An SVP of one means that the job can be learned with just a short demonstration. An SVP of two means that the job may require anything beyond a short demonstration up to 30 days of training to learn. *See King v. Chater,* No. 96–55012, 1997 WL 330838, at *3, 1997 U.S.App. LEXIS 14670, at *9 (9th Cir. June 16, 1997).

**4.** The acronym seems to refer to the Milwaukee County Mental Health Division.

**5.** Plaintiff obtained his physical medical care from Johnston Primary Care Clinic and Sinai Samaritan Medical Center. He was seen primarily for knee and back pain, and was provided pain medication. (Tr. at 161–78.)

Plaintiff described his black outs as short periods of time during which he would forget what just happened. (Tr. at 141.) Plaintiff indicated that he had abused alcohol and drugs in the past, as well as used hallucinogens such as LSD. (Tr. at 141.) He stated that he had not used alcohol in the past eight years but continued to use marijuana. (Tr. at 142.) Plaintiff advised that three years previously his house caught on fire; since then, he felt that there was fire around him and could hear the "crackling" sound of the fire. (Tr. at 142.) He stated that he felt sad and hopeless at times but denied any hallucinations. He expressed some suicidal ideation but with no intent or plans to follow through. (Tr. a 142.)

The reviewer noted that plaintiff arrived 30 minutes late for his psychological evaluation and appeared disheveled with poor hygiene.[6] (Tr. at 142.) He was friendly and talkative but avoided eye contact and was difficult to direct. His motivation also appeared questionable. No "black outs" were observed. (Tr. at 142.)

On testing, plaintiff obtained an IQ score of 72, with a range of 69–76, on the administration of the WAIS–III. This placed him in the borderline to low average range. The MMPI–II was also administered, much of it orally due to plaintiff's deficient reading ability. Plaintiff was found to have a diminished sense of self-esteem and an apparent thought disorder resulting in disorganization and confusion. He tended to perseverate, was easily distracted, and had poor problem solving

skills. (Tr. at 143.) His "black outs" were believed to be a "manifestation of his focus on bodily sensation [and] just part of his everyday experience." (Tr. at 143.) The diagnoses were:

| | |
|---|---|
| Axis I: | 311 Depression Not Otherwise Specified [NOS] |
| Axis II: | 301.22 Schizotypal Personality Disorder |
| | V62.89 Borderline Intellectual Functioning |
| Axis III: | None |
| Axis IV: | Inadequate social support, Inadequate Finances |
| Axis V: | Current GAF: 55 |

(Tr. at 144.) [7]

Plaintiff was seen for individual therapy sessions at Charter on March 31, 1999, May 4, 1999, June 2, 1999, June 10, 1999, June 15, 1999, July 7, 1999 and August 10, 1999. (Tr. at 139–40, 145–46.) He missed an August 4 session due to confusion about the appointment time. (Tr. at 139.) He was prescribed Zyprexa, which he indicated made him feel calmer, but his "blank out" spells continued. (Tr. at 139.)

In March 2000, plaintiff began receiving psychiatric treatment at the Medical College of Wisconsin, Campus Clinic South. His care was initially provided under the supervision of Dr. Jeffrey Hamblin. Plaintiff's diagnoses were psychosis, NOS, and dysthymia. His mood was noted to be stable, but he needed medication to help him sleep. Plaintiff was prescribed Zyprexa, Zoloft and Ambien, and told to follow-up in two months. (Tr. at 208.)

On April 5, 2000, plaintiff underwent an individual therapy session. He stated that

6. The evaluation was completed by psychology intern Peder Piering, M.A. under the supervision of Cathy Crandell, Ph.D. (Tr. at 144.)

7. Under the *Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV), Axis I refers to clinical disorders, Axis II to personality disorders and mental retardation, Axis III to general medical conditions, Axis IV to psycho-social and environmental problems, and

Axis V to the global assessment of functioning (GAF). The GAF is a rating of the person's psychological, social and occupational functioning. Generally, scores above 70 reflect an individual who is functioning well; scores between 50 and 60 reflect an individual with moderate impairments, who may or may not be able to work; and scores below 50 are reserved for those with severe psychological and occupational impairment.

he was "doing OK." The diagnoses were the same. (Tr. at 209.) He underwent another individual therapy session on May 16 and was found to be "thought organized and goal oriented." However, he did need to have things repeated and seemed to lose track of conversation during the session. (Tr. at 210.) During a June 7 session, plaintiff reported that his situation was essentially unchanged. His thoughts were "basically organized." He tended to wander a little at times but was easily redirected. (Tr. at 211.) A June 8 note indicates that plaintiff was stable but a little depressed. His medications were continued, and he was advised to continue therapy. (Tr. at 212.) Plaintiff arrived one and one-half hours late for his June 20 appointment, which was rescheduled to July 5. (Tr. at 213.) He was 30 minutes late on July 5th and indicated that he was confused about the time; the appointment was re-scheduled to July 19. (Tr. at 214.) Plaintiff made it to the July 19 session on time and was congratulated. His condition was basically the same. (Tr. at 215.) On August 8, plaintiff told Dr. Hamblin that he was stable on his medication with no depressive symptoms most days and no hallucinations. He was advised to continue therapy. (Tr. at 216.) During his therapy session that day, plaintiff reported to the therapist that he was keeping better track of things since his girlfriend had moved back in with him. However, he reported increased stress as the result of an assault on one of his friends by his girlfriend's daughter's boyfriend. He also reported concern about his girlfriend's health as she was being diagnosed regarding a possible brain tumor. Plaintiff's thought process was basically organized. (Tr. at 217.) On September 19, plaintiff and this therapist agreed that no additional therapy was currently needed. (Tr. at 218.)

On November 7, plaintiff returned to Dr. Hamblin and reported that he was doing well on his medication. However, Dr. Hamblin directed him to the emergency room based on plaintiff's reports of tarry stool and bloody vomit. (Tr. at 219.)

Plaintiff was scheduled to see Dr. Hamblin on February 6, 2001, but was a no call/no show. (Tr. at 220.) He returned on March 27, 2001 and reported that his girlfriend had died, which was causing difficult dreams. Dr. Hamblin noted a decrease in plaintiff's hygiene, and that plaintiff appeared sad with a blunted affect. Dr. Hamblin indicated that his plan was to re-start plaintiff's medications. (Tr. at 221.) Plaintiff was a no call/no show for his April 24 and June 12 appointments. (Tr. at 222, 223.) He returned on July 12, noting that he "gets really depressed at times." (Tr. at 224.) He indicated that he was visiting his girlfriend's grave and felt better when leaving. Dr. Hamblin noted plaintiff to have good eye contact with a full affect. Plaintiff was advised to follow up in three months. (Tr. at 224.) Dr. Hamblin continued to prescribe Ambien, Zyprexa and Zoloft through the summer of 2001. (Tr. at 225, 228.)

In October 2001, plaintiff's care was transferred from Dr. Hamblin to Dr. John Lamberton. (Tr. at 226–27.) On October 22, Dr. Lamberton prescribed Ambien. (Tr. at 226.) On October 24, plaintiff advised Dr. Lamberton that things were "about the same." (Tr. at 227.) He reported that his medications "make everything smooth" and that he was sleeping well with the Ambien. (Tr. at 227.) He reported that his mood was "alright," but that he sometimes had racing thoughts. (Tr. at 227.) Dr. Lamberton's diagnoses were psychosis, NOS, and dysthymia. (Tr. at 227.) Plaintiff's medications of Zyprexa, Zoloft and Ambien were continued, and he was advised to return in three months. Dr. Lamberton also advised

plaintiff to receive follow up care for a broken left foot. (Tr. at 227.)

On October 24, 2001, Dr. Lamberton completed a Mental Impairment Questionnaire. (Tr. at 199.) His diagnoses were:

Axis I: Psychosis, NOS. Dysthymia.
Axis II: Deferred.
Axis III: Arthritis. Broken left foot.
Axis IV: Moderate: unemployed, financial stress, death of girlfriend.
Axis V: Current GAF: 50/100.

(Tr. at 199.)

Dr. Lamberton identified plaintiff's symptoms as poor memory; oddities of thought, perception, speech or behavior; sleep disturbance; perceptual disturbances; mood disturbance; emotional lability [sic?]; blunt, flat or inappropriate affect; illogical thinking; delusions or hallucinations; decreased energy; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; paranoia; and difficulty thinking or concentrating. (Tr. 199–200.) He listed as clinical findings plaintiff's flattened affect and tangential thought patterns. He stated that plaintiff's concentration and memory were poor despite the use of medication. (Tr. at 200.) He indicated that plaintiff was taking Zyprexa, Zoloft and Ambien, which caused a side effect of drowsiness. (Tr. at 201.) He further stated that plaintiff had a low IQ and reduced intellectual functioning. (Tr. at 201.) He opined that plaintiff would be absent from work three or more times per month. (Tr. at 202.)

Dr. Lamberton rated plaintiff's functional limitations as follows: (1) "moderate" restriction of activities of daily living; (2) "moderate" difficulty in maintaining social functioning; (3) "frequent" deficiencies of concentration, persistence or pace; and (4) "repeated" (three or more) episodes of deterioration or decompensation in a work-like setting.[8] (Tr. at 205.) Dr. Lamberton noted no exertional or other physical limitations. (Tr. at 206.)

Dr. Lamberton then rated plaintiff's mental work capacity. In the category of "mental abilities and aptitude needed to do unskilled work," plaintiff's rating was "fair" in 11 sub-categories and "poor or none" in five sub-categories. (Tr. at 202–03.) These limitations were based on plaintiff's impaired memory and attention. (Tr. at 204.) In the category of "mental abilities and aptitudes needed to do semi-skilled and skilled work," plaintiff's rating was "poor or none" in two sub-categories and "fair" in two sub-categories. Again, Dr. Lamberton cited plaintiff's poor memory, concentration and attention as the basis for his conclusions. (Tr. at 204.) In the category of "mental abilities and aptitudes needed to do particular types of jobs," Dr. Lamberton rated plaintiff as "fair" in all five sub-categories. (Tr. at 204.)

### 2. Reviewing/Examining Sources

On October 28, 1999 a state-agency psychologist (whose name is illegible) reviewed plaintiff's records and completed a Psychiatric Review Technique form. (Tr. a 147.) The reviewer opined that plaintiff suffered from a severe impairment, which did not meet or equal a listed impairment. (Tr. at 147.) The reviewer first concluded, under the "A" criteria of Listing 12.04, Affective Disorders, that there was evidence of disturbance of mood with a diagnosis of depression, NOS. (Tr. at 150.) S/he next noted, under the A criteria of Listing 12.05, Mental Retardation and Autism, that plaintiff had a borderline IQ. (Tr. at 151.) Finally, s/he concluded that plaintiff had a Personality Disorder, Listing 12.08, with A criteria of seclusiveness or autistic thinking and pathological dependence. (Tr. at 152.) In considering impairment severity, i.e. the B criteria, s/he concluded that plaintiff had "slight" restriction of activities of daily living;

---

8. These are the "B criteria" of Listings 12.04 and 12.05.

"moderate" difficulty in maintaining social functioning; "often" experienced deficiencies of concentration, persistence or pace; and "never" experienced episodes of deterioration in a work-like setting. (Tr. at 154.)

The same reviewer then completed a Mental RFC Assessment, concluding that plaintiff was no more than moderately limited in any of the listed categories. (Tr. at 156–57.) The reviewer concluded:

> He's not psychotic, his mood is mildly depressed, his anxiety level and concentration are improved with recent introduction of Zyprexa. His ADLs [activities of daily living] are functional and varied, consistent with borderline IQ. His family made few demands of him and he's not learned good work habits. He needs DVR as he retains basic mental abilities for unskilled work. I'd just deny with evidence in file.

(Tr. at 158.)

On August 8, 2000, Dr. Anthony Matkom completed a Psychiatric Review Technique form for the Administration. He largely agreed with the previous reviewer that while plaintiff had severe mental impairments, none met or equaled a listed impairment. (Tr. at 189–97.) Dr. Matkom evaluated plaintiff under Listing 12.04, Affective Disorders, finding the presence of feelings of guilt/worthlessness and difficulty concentrating or thinking under the A criteria. (Tr. at 192.) Under Listing 12.05, Mental Retardation and Autism, Dr. Matkom noted the presence of borderline intelligence. (Tr. at 193.) However, unlike the previous reviewer, Dr. Matkom found no evidence of a Personality Disorder under Listing 12.08. (Tr. at 194.) Under the B criteria, Dr. Matkom found that plaintiff had "slight" restrictions of activities of daily living; "moderate" difficulties in maintaining social functioning;

"often" experienced deficiencies of concentration, persistence or pace; and "never" experienced episodes of deterioration in a work-like setting. (Tr. at 196.) Thus, he concluded that plaintiff did not meet Listings 12.04 and 12.05.

In a Mental RFC Assessment completed on the same date, Dr. Matkom indicated that plaintiff was moderately limited in some areas of functioning but not significantly limited in others. He found no marked limitations. (Tr. at 185–88.) He concluded that while plaintiff had "some attention and concentration problems" and "borderline intelligence," he had "adequate social skills" and was "capable of most functional ADL's." (Tr. at 187.) Thus, according to Dr. Matkom, plaintiff was "capable of routine, unskilled work." (Tr. at 187.)

Plaintiff was seen and evaluated by Paul West, Ph.D. at the behest of the Administration on July 5, 2000. In a July 24 report, Dr. West wrote that his assessment verified plaintiff's "difficulty with depression and some attention and concentration problems." (Tr. at 183.) Dr. West stated that plaintiff "did demonstrate attention, and concentration during this examination that may make employability difficult, which is consistent with his report of job failures in the past due to poor attention." (Tr. at 183.) Dr. West opined that plaintiff did "possess adequate social skills for employability," although he "would need to attend to hygiene patterns" in order to hold a job. (Tr. at 183.) Dr. West observed no "obvious evidence of a thought disorder." "However, his mood continues to be dysphoric and consistent with long-standing low self-esteem pattern." (Tr. at 183.) Dr. West confirmed a "low average or lower general level of functioning." (Tr. at 183.) His diagnoses were:

| | |
|---|---|
| Axis I: | Depression, NOS. Polysubstance dependence in remission. |
| Axis II: | Schizotypal personality features. |
| Axis III: | Status post back injury. |
| Axis IV: | Moderate. |
| Axis V: | Current GAF: 55. Highest GAF in the past 12 months: 55. |

(Tr. at 184.)

### D. ALJ and Appeals Council Decisions

On January 23, 2002, the ALJ issued a decision denying plaintiff's claim. (Tr. at 14.) She concluded that plaintiff was unemployed and that he suffered from depression, NOS, borderline intellectual functioning and a history of substance abuse, but that none of these conditions met any of the listings.[9] (Tr. at 21, 23.) She found that based on his impairments plaintiff was limited "to low stress, unskilled work activities that are simple and repetitive in nature and require no contact with the public." (Tr. at 23.) Plaintiff had no past relevant work activity, so the ALJ moved to step five. Relying on the testimony of the VE and using Grid Rule 204.00 as a framework, the ALJ concluded that there were a significant number of jobs plaintiff could do, e.g. 65,000 unskilled cleaner positions and 25,000 assembler positions. (Tr. at 22–24.) Therefore, she concluded that plaintiff was not disabled under the Act. (Tr. at 24.)

On February 23, 2002, plaintiff requested review by the Appeals Council, arguing that he should be found disabled based on a listed mental impairment. (Tr. at 238.) He also submitted a variety of new medical reports and records.[10] (Tr. at 241–96.) The Council received the additional medical evidence but nevertheless found no rea-

son to review the ALJ's decision and denied plaintiff's request. (Tr. at 6, 9–10.)

### III. DISCUSSION

Plaintiff urges three bases for reversal. First, he contends that the ALJ failed to properly evaluate his credibility. Second, he argues that the ALJ improperly evaluated the opinion of Dr. Lamberton, a treating source. Third, he argues that the ALJ's evaluation of his mental impairment was improper. He requests that the case be remanded for an award of benefits or, in the alternative, re-hearing. I address each argument in turn.

### A. Evaluation of Plaintiff's Credibility

#### 1. Credibility Standard

■ Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing. *Brown v. Barnhart*, 298 F.Supp.2d 773, 793 (E.D.Wis.2004). Thus, ordinarily, the court will reverse an ALJ's credibility determination only if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir.2003). But, as always, the ALJ must abide by the Commissioner's Rulings and Regulations in making her findings. *Brown*, 298 F.Supp.2d at 793.

■ In evaluating a claimant's credibility, the ALJ must comply with SSR 96–7p. *Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir.2003); *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir.2003). That Ruling provides, in pertinent part:

> In determining the credibility of the individual's statements, the adjudicator

---

**9.** The ALJ found that plaintiff had no exertional limitations based on his physical problems. (Tr. at 19.) Plaintiff does not challenge that determination in this court.

**10.** Because plaintiff does not seek a sentence six remand or argue that the Appeals Council

committed an error of law in declining to review the ALJ's decision, I do not consider this evidence, which was not before the ALJ. *See Keys v. Barnhart*, 347 F.3d 990, 992–93 (7th Cir.2003).

must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

SSR 96–7p.

In evaluating credibility under SSR 96–7p, relevant considerations include:

1. The individual's daily activities;
2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

The adjudicator must also analyze whether the claimant's testimony is consistent with the medical evidence and with previous statements the claimant made to doctors and the Administration. SSR 96–7p.

The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

SSR 96–7p.

 Thus, while an ALJ's conclusion as to credibility is afforded great deference, the manner in which the ALJ reaches that conclusion is, as noted above, highly regulated. If on § 405(g) review the court finds that the ALJ followed the proper procedures and considered the relevant factors, the ALJ's determination is ordinarily conclusive. However, if the court is unable to conclude that the ALJ complied with SSR 96–7p, it should reverse, even if the evidence suggests that the ALJ may have been right.[11]

---

11. Administrative decisions are subject to harmless error review. *Keys v. Barnhart,* 347

Insistence that ALJs comply with the SSRs is not nitpicking.[12] Compliance with SSR 96–7p serves two primary purposes.[13] First, an ALJ who considers the relevant factors and articulates her reasoning process is more likely to reach the "correct" result. Second, requiring ALJs to follow procedures and sufficiently articulate their findings has a due process component; claimants should feel that they received a full and fair hearing from judicial officers who took their claims seriously. The latter point also ties into the judicial standard of review of an administrative decision.

> [T]he cases make clear that the ALJ must specify the reasons for his finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony.... [G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.

*Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003).

### 2. Plaintiff's Allegations of Error

Plaintiff alleges two specific violations of SSR 96–7p by the ALJ.

#### a. The ALJ's Finding Was Limited to "Black Outs"

■ Plaintiff first contends that the ALJ limited her credibility determination to the single issue of his "black out" epi-sodes, ignoring other aspects of his testimony as well as his previous statements to his doctors and the Administration. He argues that this was error because his claim was not based only on "black outs."

The Commissioner responds that the ALJ properly considered a variety of factors and reasonably concluded that plaintiff's allegations were not entirely credible. For example, the ALJ considered the objective medical evidence, finding that it did not support plaintiff's claims. The ALJ also noted that, contrary to plaintiff's claims of poor concentration and memory, plaintiff's doctors at times described his concentration as "fair," and that plaintiff's doctors had been unable to verify his alleged "black outs." Further, the ALJ discussed plaintiff's activities of daily living and the effectiveness of the treatment he received. Thus, the Commissioner argues that the ALJ properly assessed plaintiff's allegations and reached a conclusion that was not patently wrong.

Despite these arguments, I agree with plaintiff that the ALJ's credibility determination was deficient in this regard. The only explicit credibility finding the ALJ made was as follows: "The claimant's testimony concerning his alleged 'blank out' episodes is found not to be credible as such testimony is not supported by the objective medical evidence of record." (Tr. at 23.) The ALJ did not rule on the other aspects of plaintiff's testimony or his previous

---

F.3d 990, 994 (7th Cir.2003). Thus, there may be instances where a technical violation of an SSR does not require reversal.

**12.** I am not unsympathetic to the argument that courts might sometimes require too much of busy administrative judges. *Cf. Guchshenkov v. Ashcroft*, 366 F.3d 554, 560 (7th Cir.2004) (Evans, J., concurring). These judicial officers face a difficult task in seeking to ensure that those who are truly disabled receive benefits while those who are exaggerating the severity of their conditions do not.

There are limits to the precision of language and specificity of reasons ALJs can provide in explaining why they found a claimant's testimony credible or incredible. (District judges face the same difficulty in deciding issues of credibility.)

**13.** SSR 96–7p ("This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.").

statements to medical providers and the Administration. This was error. SSR 96–7p ("If an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other persons concerning the individual's symptoms.").[14] For example, the record also contains testimony and statements by plaintiff concerning his memory problems and inability to concentrate and follow instructions.

While the ALJ did discuss the medical evidence, plaintiff's activities of daily living, and the effectiveness of medical treatment in the body of her decision, I cannot infer a credibility determination from a general discussion of the evidence. *Golembiewski,* 322 F.3d at 915–16 (rejecting Commissioner's argument that body of ALJ's decision implicitly supplied reasons for rejecting plaintiff's testimony, and stating that "nothing in Social Security Ruling 96–7p suggests that the reasons for a credibility finding may be implied"). Even if I could look to the ALJ's review of the evidence, the decision contains no bridge from the evidence to the conclusion that plaintiff's testimony was not credible. *See Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir.2002) ("Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed.").

For instance, the decision contains no indication that plaintiff's activities of daily living were inconsistent with his testimony. The ALJ stated that plaintiff "is able to drive," "obtains food from food pantries," "has a couple of·friends with whom he visits ... and has a dog for a pet." (Tr. at 18.) None of these activities suggest that plaintiff may have exaggerated the severity of his mental impairment or that he is capable of full-time work. *See Zurawski,* 245 F.3d at 887 (rejecting credibility determination based on plaintiff's daily activities where such activities were fairly restricted and ALJ failed to explain how they contradicted plaintiff's testimony); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir.2000) (holding that minimal daily activities do not establish that a person is capable of engaging in substantial physical activity). The ALJ also noted that plaintiff's "grooming and hygiene were quite poor ... and he advised the undersigned that he had last taken a shower approximately three weeks prior to the date of the hearing." (Tr. at 18.) While I am aware of no rule holding that a person may be found disabled based solely on a refusal to bathe, plaintiff's poor hygiene may be byproduct of his mental illness, an issue the ALJ should have explored.[15]

The ALJ's discussion of the medical evidence and effectiveness of treatment also failed to build a bridge from the evidence to the conclusion that plaintiff was not credible. The ALJ seemed to draw from

---

**14.** "The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the 'other sources' defined in 20 C.F.R. 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process ...." SSR 96–7p.

**15.** Section DI 25020.010B.5. of the Program Operations Manual System ("POMS") provides: "Most competitive jobs require the ability to meet basic standards of neatness and cleanliness." This provision is contained in the section dealing with Mental Impairments, suggesting that in order to support a finding of disability the inability to maintain hygiene must be a byproduct of mental illness.

this evidence the conclusion that plaintiff was benefited by treatment and was often described as "stable." But this does not mean that plaintiff's contention that he was unable to work was incredible. One can be stable and yet disabled. .

██ Finally, the ALJ's decision does not reveal that she considered several other factors set forth in SSR 96–7p. While "SSR 96–7p . . . does not require an ALJ to analyze and elaborate on each of the seven factors set forth when making a credibility determination," *Clay v. Apfel*, 64 F.Supp.2d 774, 781 (N.D.Ill.1999), "the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning." *Brown*, 298 F.Supp.2d at 792 (citing *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir.2002)). Of particular importance, it appears that the ALJ failed to consider factors that precipitate and aggravate plaintiff's symptoms. When considering a claim based on a mental impairment, the adjudicator should identify the specific stressors which may aggravate the claimant's symptoms, determine how the individual may react to such stressors in a work setting, then factor such findings in the RFC assessment. *See* SSR 85–15. That was not done here.[16]

### b. The ALJ Applied an Incorrect Legal Standard

Plaintiff next argues that the ALJ applied an incorrect legal standard in making her credibility determination. The ALJ said that plaintiff's testimony "is found not to be credible as such testimony is not supported by the objective medical evidence of record." (Tr. at 23.) However, SSR 96–7p states: "An individual's statements . . . may not be disregarded solely because they are not substantiated by objective medical evidence."

██ The Commissioner fails to specifically address this argument in her brief. Therefore, she has waived her right to do so. *See Patterson v. Chater*, 978 F.Supp. 514, 519 (S.D.N.Y.1997). In any event, the Seventh Circuit has made clear that—consistent with SSR 96–7p—"the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995). That court has consistently reversed credibility determinations similar to the one in the present case. *See, e.g., Brindisi*, 315 F.3d at 787 (rejecting as contrary to SSR 96–7p credibility determination stating "to the extent that the claimant's parents alleged total disability, the undersigned do[es] not find them fully credible, as it is not supported by the objective medical evidence and other evidence of record"); *Zurawski*, 245 F.3d at 887 (rejecting under SSR 96–7p ALJ's finding that plaintiff's complaints were "not entirely credible due to the inconsistencies with the objective medical evidence, and inconsistencies with daily activities").

Because the ALJ failed to comply with SSR 96–7p in making her credibility determination in the present case, her decision must be reversed and the matter remanded for rehearing.[17]

---

16. The record does contain evidence that plaintiff has difficulty dealing with what he perceives to be stressful situations. (*See* Tr. at 143 ("He tended to somatize and complained of headache when under stress. He was also observed to laugh inappropriately several times throughout the evaluation.").)

17. Plaintiff also argues that his testimony concerning "black out" spells was supported by objective medical evidence. He cites the report of Mr. Piering and Dr. Crandell, in which they state that "these 'black outs' are a manifestation of his focus on bodily sensation, and that they are just a part of his everyday experience." (Tr. at 143.) It is not the task of the reviewing federal court to weigh medical evi-

**B. Evaluation of Dr. Lamberton's Opinion**

**1. Treating Source Standard**

 Under the Commissioner's Rulings and Regulations, the ALJ evaluates medical opinions differently depending on the source. Opinions from the claimant's treating physician (a/k/a "treating source") are entitled to special consideration. *Dominguese v. Massanari,* 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). In some instances—where the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with other substantial evidence—the ALJ must afford it "controlling weight." *Id.* (citing SSR 96–8p); 20 C.F.R. § 404.1527(d)(2). Even if the ALJ finds that the treating source opinion is not entitled to controlling weight, she may not simply reject it. SSR 96–2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the plaintiff's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision." *Wates,* 274 F.Supp.2d at 1034 (quoting 20 C.F.R. § 404.1527(d)(2)).

The Commissioner has defined the term "treating source" as follows:

Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

20 C.F.R. § 404.1502.

If a medical provider who personally evaluated the claimant does not qualify as a treating source, whose report may receive controlling weight, s/he will nevertheless be considered an "examining source," whose opinion is generally entitled to more weight than that of a provider who did not examine the claimant.[18] 20 C.F.R. § 416.927(d)(1); *see also Brown,* 298 F.Supp.2d at 789 (stating that ALJ

dence. On remand, plaintiff may emphasize this evidence to the ALJ.

18. "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96–6p.

may reject report of examining source only for reasons supported by substantial evidence); *Samuel*, 295 F.Supp.2d at 948 (same). Finally, the regulations provide that the reports of non-examining or consultative sources must also be considered. 20 C.F.R. § 416.927(f). However, the Seventh Circuit has held that such opinions, by themselves, do not constitute substantial evidence sufficient to justify the rejection of an examining physician's opinion. *Gudgel*, 345 F.3d at 470.

### 2. Plaintiff's Allegations of Error

Plaintiff alleges that the ALJ improperly evaluated Dr. Lamberton's opinion. Plaintiff notes that the ALJ's rejection of Lamberton's report is significant because that report supported a finding that plaintiff suffered from listed impairments (step three) and contained work limitations that the VE testified would preclude employment (step five).

Regarding this report, the ALJ stated: The undersigned declines to find that the claimant is suffering from an impairment or combination of impairments that meets or equals the requirements of an impairment cited in the Listing of Impairments. The expert opinion of Dr. Lamberta [sic] suggests that the claimant's functional limitations due to his impairments are of a degree that meets the requirements of sections 12.04 and/or 12.05 of the Listing of Impairments. However, the undersigned finds that his expert opinion is not controlling and declines to give significant weight to his expert opinion (see: section 416.927). A review of the medical evidence in the claimant's case indicates that Dr. Lamberta [sic] is not the claimant's treating physician/psychiatrist. In fact, the claimant's treating psychiatrist appears to be Dr. J. Hamblin (Exhibit 9F). Dr. Hamblin's treatment records are significantly at odds with the October, 2001, report submitted by Dr. Lamberta [sic].

For instance, Dr. Hamblin's records reflect that the claimant is not experiencing any medication side-effects and that the claimant's mood and affect are generally stable and full. Contrary to Dr. Lamberta's [sic] report, the claimant has not been noted by Dr. Hamblin to experience any hallucinations and, in fact, Dr. Hamblin has described the claimant as generally stable and "doing well" on medication therapy. Thus, the undersigned is impressed that there is substantial evidence in the record that is contrary to the expert [sic] of the opinion of Dr. Lamberta [sic] and, thus, his expert opinion is not controlling.

(Tr. at 21.)

Plaintiff notes several problems with this analysis. First, he points out that the ALJ improperly referred to the doctor as "Lamberta" rather than "Lamberton." He suggests that this "may have been a factor in the ALJ's not recognizing the existence of Dr. Lamberton." (Plt.'s Brf. at 15.) However, it is clear from the ALJ's decision that the person she referred to as "Lamberta" was "Lamberton." Further, as the Commissioner notes, plaintiff's own lawyer referred to the doctor as "Lamberta" (Tr. at 198), and even the doctor's printed name is somewhat difficult to make out (Tr. at 206). Thus, I cannot fault the ALJ for this mis-spelling.

Second, plaintiff argues that the ALJ erred in not evaluating Dr. Lamberton as a treating source. The ALJ seemed not to recognize that plaintiff's care was transferred from Dr. Hamblin to Dr. Lamberton in October 2001. Plaintiff acknowledges that at the time he prepared the October 24, 2001 report, Dr. Lamberton had just recently assumed responsibility for his care. Nevertheless, he contends that there is no bright line rule for determining when a doctor should be considered a treating source. Rather, the Commis-

sioner must consider a variety of factors. *See* 20 C.F.R. § 404.1502; *see also* SSR 96–2p.

The Commissioner does not respond to plaintiff's contention that the ALJ missed the transfer from Hamblin to Lamberton. Nevertheless, she argues that the ALJ was correct in finding that Dr. Lamberton was not a treating source. Because he had examined plaintiff just once at the time he prepared the report, Dr. Lamberton did not have the ongoing, treating relationship required under the regulations.

■■■ It is unclear whether Dr. Lamberton could be considered plaintiff's "treating source" at the time he prepared the October 24, 2001 report (or at the time of the hearing in November 2001 and the ALJ's decision in January 2002).[19] In any event, this is a matter for the ALJ and not the court to decide, after a proper consideration of the evidence under § 404.1502. It appears from her decision that the ALJ did not realize that Dr. Hamblin had transferred plaintiff's care to Dr. Lamberton.[20] Neither does it appear she realized that Dr. Lamberton had examined plaintiff before preparing his report. It is possible that none of this will change her analysis of Dr. Lamberton's opinion.[21] Nevertheless, when the court cannot be sure that the ALJ considered important evidence it must remand the matter for another look. *See, e.g., Brindisi,* 315 F.3d at 787; *Scott,* 297 F.3d at 595.[22]

**19.** The records plaintiff submitted to the Appeals Council show that Dr. Lamberton continued to treat plaintiff into July 2003. (Tr. at 286.) However, as stated previously, I may not consider those records in reviewing the ALJ's decision. *See* note 10, *supra.*

**20.** In the everyday use of the term, Dr. Lamberton was then plaintiff's "treating" physician. This, of course, does not mean that he was a treating source under the Commissioner's regulations.

## C. Evaluation of Plaintiff's Mental Impairment

Finally, plaintiff alleges two errors by the ALJ in evaluating his mental impairment. First, he contends that the ALJ ignored favorable medical evidence. Second, he contends that the ALJ's RFC determination—that plaintiff was "restricted to low stress, unskilled work activities that are simple and repetitive in nature and that require no contact with the public" (Tr. at 23)—was essentially meaningless because the terms "simple," "repetitive" and "low stress" are undefined and do not limit plaintiff's work activities, and because the ALJ failed to first undertake the function-by-function assessment required by SSR 96–8p.

### 1. Favorable Evidence

■■■ Plaintiff states that the ALJ overlooked the finding by Peder Piering, M.A. and Cathy Crandell, Ph.D. that he "has a tendency to perseverate making redirection difficult at times[,] is often disorganized and easily distracted, [and had] poor problem solving skills." (Tr. at 143.) While the ALJ did not specifically mention this portion of the Piering/Crandall assessment, she did discuss their report. (Tr. at 19.) The ALJ need not provide a complete written evaluation of every piece of evidence. *Henderson by Henderson v. Apfel,* 179 F.3d 507, 514 (7th Cir.1999).

**21.** To the extent that the ALJ may have believed Dr. Lamberton's role was only to provide a report in support of plaintiff's claim, her misunderstanding may have been critical.

**22.** Plaintiff takes issue with some of the inconsistencies between Hamblin's notes and Lamberton's report noted by the ALJ. He also contends that the ALJ ignored the many similarities between the findings of the two doctors. On remand, plaintiff may argue these issues to the ALJ, whose duty it is to weigh the medical evidence.

Plaintiff also states that the ALJ failed to discuss the reports of the state agency consultants, specifically their findings that plaintiff would "often" have deficiencies of concentration, persistence or pace. (Tr. at 154, 196.) This, he contends, was violative of SSR 96–6p (which requires ALJs to consider and explain the weight afforded to the reports of psychological consultants) and SSR 96–8p (which requires the ALJ to base the RFC determination of all of the relevant evidence, including the medical source statements). The Commissioner responds that the consultants' findings concerning concentration, persistence and pace were made at steps two and three; plaintiff ignores the fact that these physicians concluded that plaintiff did not have a listing-level impairment and that he retained the ability to perform unskilled work—opinions consistent with the ALJ's findings. (Tr. at 158, 187.)

 In her decision, the ALJ mentioned the report of examining consultant Dr. West, but she did not mention the reports of the consultants who completed paper reviews. (Ex. 2F, Tr. at 147; Ex. 3F, Tr. at 156; Ex. 6F, Tr. at 185; Ex. 7F, Tr. at 189.) This was contrary to SSR 96–6p, which provides in pertinent part:

> State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act. As members of the teams that make determinations of disability at the initial and reconsideration levels of the administrative review process (except in disability hearings), they consider the medical evidence in disability cases and make findings of fact on the medical issues, including, but not limited to, the existence and severity of an individual's impairment(s), the existence and severity of an individual's symptoms, whether the individual's impairment(s) meets or is equivalent in

severity to the requirements for any impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 (the Listing of Impairments), and the individual's residual functional capacity (RFC).

> Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs, the rules in 20 C.F.R. [§§ ]404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists. Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.

SSR 96–6p.

It is true, as the Commissioner states, that these consultants did not find that plaintiff suffered from a listed impairment, like the ALJ. (*Compare* Tr. at 22 *with* Tr. at 154, 196.) Further, their reports could be seen as consistent with the ALJ's RFC determination. (*Compare* Tr. at 21, 23 # 4 *with* Tr. at 156–58, 185–87.) Thus, an argument could be made that while the ALJ committed an error of law in ignoring these opinions, the error was harmless. *See Keys v. Barnhart,* 347 F.3d 990, 994 (7th Cir.2003) (holding that the doctrine of harmless error is applicable to judicial review of administrative decisions). However, because this matter must be remanded anyway, I will include in my order a requirement that the ALJ consider these opinions.

## 2. RFC Determination

Plaintiff seems to have two complaints about the ALJ's RFC determination.

First, the ALJ failed to evaluate his limitations and assess his work-related abilities on a function-by-function basis, as required by SSR 96–8p. Second, the ALJ's assessment that plaintiff was capable of "simple," "repetitive" and "low stress" work provided no meaningful limitation on work capacity based on his severe mental impairment.

The Commissioner responds that the Seventh Circuit has approved similar RFC findings. *See, e.g., Johansen v. Barnhart,* 314 F.3d 283, 288 (7th Cir.2002) ("mental RFC to perform repetitive, low-stress work"); *Sims v. Barnhart,* 309 F.3d 424, 431 (7th Cir.2002) ("RFC of simple and repetitive light work"). However, the plaintiffs in those cases were not mounting the sort of challenge made here. In *Johansen,* the plaintiff argued that the RFC assessment was not based on substantial evidence. 314 F.3d at 288–89. Likewise, in *Sims,* the plaintiff argued that the ALJ had ignored certain evidence in determining RFC. 309 F.3d at 431–32. On this issue, plaintiff does not argue that the evidence was insubstantial; rather, he contends that the ALJ's mental RFC determination was non-specific and contrary to SSR 96–8p.

The determination of mental RFC is crucial to the evaluation of the claimant's ability to work when his impairment does not meet or equal the criteria of the listings, but is nevertheless severe. The RFC assessment requires consideration of an expanded list of work-related capacities that may be affected by mental disorders. *Wates,* 274 F.Supp.2d at 1036–37; *see also* 20 C.F.R. § 404.1520a(c)(3). As noted above, the broad factors that the ALJ must consider include the ability to (1) understand, remember and carry out simple instructions; (2) make simple work-related decisions; (3) respond appropriately to supervision, coworkers and custom-

ary work pressures in a work setting; and (4) deal with routine changes in work settings.[23] *See* 20 C.F.R. § 404.1545(c); SSR 96–9p; SSR 85–16; Social Security Program Operations Manual System ("POMS") DI 25020.010A.3.a. An individual who has suffered a "substantial loss" in the ability to meet any of these work-related demands is considered disabled. SSR 85–15; POMS DI 25020.010A.3.b.

When evaluating the mental ability to perform unskilled work (which was at issue in the present case), the ALJ is supposed to consider the claimant's ability to:

a. remember work-like procedures

b. understand and remember very short and simple instructions

c. carry out very short and simple instructions

d. maintain attention for extended periods of 2–hour segments

e. maintain regular attendance and be punctual within customary tolerances

f. sustain an ordinary routine without special supervision

g. work in coordination with or proximity to others without being (unduly) distracted by them

h. make simple work-related decisions

i. complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods

j. ask simple questions or request assistance

k. accept instructions and respond appropriately to criticism from supervisors

---

**23.** Each of the factors contain sub-categories, POMS DI 25020.010B.2, which are listed on the mental RFC forms used by the Administration. (*See* Tr. at 156–57.)

l. get along with coworkers or peers without (unduly) distracting them or exhibiting behavioral extremes

m. respond appropriately to changes in a (routine) work setting

n. be aware of normal hazards and take appropriate precautions

POMS DI 25020.010B.3;[24] *see also* SSR 85–16 ("Residual Functional Capacity for Mental Impairments").

SSR 96–8p states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."[25]

■ In the present case, the ALJ failed to assess plaintiff's mental abilities on a function-by-function basis under § 404.1545(c). Instead, she proceeded to directly assign vocational categories without first evaluating functional capacity. Further, the ALJ offered no explanation for and cited no medical evidence supporting her RFC assessment. *See Samuel v. Barnhart*, No. 02–C–0569, 316 F.Supp.2d 768, at 772 (E.D.Wis.2004) (noting that,

under SSR 96–8p, the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence). Thus, the matter must be remanded. On remand, the ALJ must re-visit the issue of mental RFC and more fully explain the basis for her conclusion. In so doing, she must also comply with SSR 85–15, SSR 85–16 and SSR 96–8p, and 20 C.F.R. §§ 404.1520a & 404.1545(c).

However, I cannot accept plaintiff's argument that the ALJ's conclusion as to RFC was meaningless. It is true, as plaintiff notes, that an ALJ cannot find a mental impairment severe and then fail to include any limitations based on the impairment in the RFC determination. *Spears v. Barnhart*, 284 F.Supp.2d 477, 483 (S.D.Tex.2002). But it appears that in the present case the ALJ did limit plaintiff's ability to work based on his severe mental impairment by limiting him to simple, unskilled, low stress work that required no contact with the public. I cannot agree with plaintiff that the terms "simple," "repetitive" and "low stress"—which are littered throughout the Commissioner's regulations and rulings[26]—are meaningless. Plaintiff cites no authority for the proposition that a mental RFC assessment employing these terms is invalid.[27]

**24.** This section of the POMS concerns DIB rather that SSI claims. However, the standard for both is essentially the same. *See Kapusta v. Sullivan*, 900 F.2d 94, 95 n. 5 (7th Cir.1989)

**25.** When dealing with physical abilities, the ALJ must first determine the claimant's ability to sit, stand, walk, lift, carry, push and pull before assigning an exertional category, e.g. sedentary, light, medium, heavy. *Gotz v. Barnhart*, 207 F.Supp.2d 886, 896 (E.D.Wis. 2002) (citing SSR 96–8p).

**26.** *See, e.g.*, SSR 85–15 ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and

remember *simple* instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.") (emphasis added).

**27.** SSR 96–8p is less than clear on what an ALJ is required to do when explaining mental RFC. When assessing physical RFC, the requirement is simple: the ALJ must first determine the claimant's ability to sit, stand, walk, lift, carry, push and pull before assigning an exertional category, e.g., sedentary, light, medium, heavy. *Gotz v. Barnhart*, 207 F.Supp.2d 886, 896 (E.D.Wis.2002) (citing SSR 96–8p). SSR 96–8p contains no similar directive regarding the manner in which the

## IV. CONCLUSION

Plaintiff argues that the matter should be remanded for an award of benefits. He notes that he is borderline mentally retarded and psychotic to the extent that he is unable to manage personal hygiene at a level that would be acceptable to any employer. Only in the alternative does he request a remand for further proceedings.

Ordinarily, when a district judge reverses an ALJ's decision the appropriate remedy is a remand for further proceedings. There are two exceptions to the general rule: (1) where the record overwhelmingly supports a finding of disability; and (2) where the delay involved in repeated remands has become unconscionable, or the agency has displayed obduracy in complying with the law as set down by the court. *Worzalla v. Barnhart,* 311 F.Supp.2d 782, 800 (E.D.Wis.2004). Neither exception applies here. The ALJ's decision is being reversed primarily because she failed to properly evaluate the evidence. It is the job of the ALJ, not the court, to weigh the evidence, resolve conflicts, and determine whether the claimant is disabled. *Id.* The evidence supporting plaintiff's claim was not overwhelming, and the ALJ should be given the opportunity to re-consider the matter consistent with this decision. Further, this is plaintiff's first § 405(g) appeal, and there is no indication that the Commissioner has stubbornly refused to apply the law to plaintiff's claim.

**THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four. On remand, the ALJ must re-evaluate the credibility of plaintiff's statements under SSR 96–7p; re-evaluate the opinion of Dr. Lamberton,

considering whether he qualifies as a treating source; and re-evaluate plaintiff's mental impairment and RFC, considering all of the evidence of record, including the reports of the state agency consultants, and explaining the basis for her conclusions under the applicable regulations and rulings.

ALJ may translate mental RFC into categories or otherwise express it in shorthand fashion.